# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **NARDYNE JEFFERIES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 11-1159 (RCL)** |
| | ) | |
| **DISTRICT OF COLUMBIA,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

# <u>MEMORANDUM OPINION</u>

Before the Court is defendants District of Columbia and Cathy Lanier's Motion to Dismiss Plaintiff's Complaint, Mar. 27, 2012, ECF No. 22.  Upon consideration of the motion, the plaintiff's Opposition, May 7, 2012, ECF No. 24, the defendant's Reply thereto, May 22, 2012, ECF No. 26, and the record herein, the Court will grant in part and deny in part defendants' motion.

## I.    BACKGROUND

This case arises out of the tragic March 30, 2010 death of sixteen-year-old Brishell Jones. Compl. ¶ 19, June 23, 2011, ECF No. 1-1.  After Jones attended a funeral service for Jordan Howe, a young homicide victim, she was killed in a retaliatory drive by shooting.  *Id.* ¶ 40.  The United States Attorney charged five men in connection with the shooting.  *Id.* ¶¶ 22–23.  These men have since been convicted of serious charges.  *See* Keith L. Alexander, Theresa Vargas & Paul Duggan, *D.C. jury convicts 5 of murder in attacks*, WASH. POST, May 8, 2012, at A14.

Jeffrey Best, Robert Bost, and Orlando Carter were sentenced to life without the possibility of parole. *See* Paul Duggan & Heather Hermann, *Long sentences for 5 in 2010 killings*, WASH. POST, Sept. 12, 2012, at B5. Lamar Williams was sentenced to a term of 30 years for providing the AK-47 style assault rifle used in the killings. *Id.* Nathaniel Simms cooperated with prosecutors, pled guilty to murder, and was sentenced to 25 years. *See* Keith L. Alexander, *Nathaniel Simms sentenced to 25 years for 2010 shootings*, WASH. POST, Oct. 20, 2012, at B4. Sanquan Carter, whose killing of Jordan Howe precipitated the drive by that took Jones' life, was sentenced to 54 years for Howe's murder. Duggan & Hermann, *Long Sentences*, *supra* at B5.

Plaintiff Nardyne Jefferies—the mother of decedent Brishell Jones and the personal representative of her estate, Compl. ¶¶ 20–21—seeks to hold a wide array of government agencies and officials responsible for her daughter's death. The Complaint[1] claims that Jones' death was the result of "the [Assistant U.S. Attorneys]' and D.C. Government officials', agencies', and employees' customs, practices, and culture of action and inaction based on irresponsible judgment and decision-making; negligence; gross negligence; willful disregard; racial discrimination; and deliberate indifference to the safety, welfare, and the life of Brishell Jones, and African American teenagers, in particular, and African American Youths in the

---

[1]    The plaintiff's Complaint incorporates by reference all the factual allegations made in her Notice of Claim filed with the Office of the Mayor on September 30, 2010. *See* Compl. ¶ 33 n.1. The plaintiff has recently filed that Notice of Claim with this Court. *See* Notice of Claim Against D.C. Pursuant to D.C. Code (2001) § 12-309, Sept. 29, 2010, ECF No. 30-1 (flied as Ex. 1 to Pl.'s Mot. for Submission of Related Doc., Dec. 17, 2012, ECF No. 30). The Court has reviewed the Notice of Claim and the facts alleged therein. Generally, when the Court refers to "the Complaint" or "plaintiff's Complaint," it refers to the Civil Complaint docketed at ECF No. 1-1, and all materials incorporated by reference in that Civil Complaint, including the aforementioned Notice of Claim.

The plaintiff also incorporates by reference a privileged and confidential memorandum by the Office of the Attorney General, looking into the practices and procedures of the Department of Youth Rehabilitation Services ("DYRS"). Then-D.C. Attorney General Peter Nickles wrote this memorandum. *See* Compl. ¶ 33 n.2; Peter J. Nickles, *Memorandum re: Review of DYRS records regarding committed youth arrested in DC for murder or assault with intent to murder in 2009-2010* (hereinafter "Nickles Report"), May 20, 2010 (available at http://voices. washingtonpost.com/debonis/dyrs_report_oag.pdf). This memorandum is less an investigation into the facts, and more a general criticism of the policies of DYRS, and recommendations for changes going forward. This report was not attached to the original Complaint, and as a "leaked" privileged memorandum, not part of the "public record;" but to the extent the memorandum alleges any facts not already in the Civil Complaint—not conclusions, generic observations, or recommendations, but *facts*—the Court considers them as incorporated by reference.

District of Columbia and their families, in general." *Id.* ¶ 24.   This Court has dismissed plaintiff's claims against the D.C. Department of Human Services, D.C. Department of Youth Rehabilitation Services, D.C. Department of Mental Health, D.C. Metropolitan Police, Justice Grants Administration, D.C. Fire and Emergency Medical Services, D.C. Criminal Justice Coordinating Council, D.C. Office of the Attorney General, D.C. Housing Authority, Mayor Vincent Gray, U.S. Attorney Ronald Machen, Office of the U.S Attorney for D.C., Court Services and Offender Supervision Agency for D.C., D.C. Pretrial Services Agency, and the United States of America.  Orders Granting Mots. Dismiss, Mar. 27, 2012, ECF Nos. 18, 20, 21.

Plaintiff's Complaint describes the events preceding the death of Brishell Jones.   On March 21, 2010, Sanquan Carter lost a bracelet at a party.  Compl. ¶ 34.  Just past midnight on March 22, Sanquan Carter called his brother Orlando, claiming someone stole his bracelet. Orlando Carter arrived at the location of the party, along with Nathaniel Simms and Jeffrey Best. The group opened fire at the partygoers, killing Jordan Howe.  *Id.*

On March 22, 2010, the Metropolitan Police Department for the District of Columbia ("MPDC") began investigating this shooting.  *Id.* ¶ 35.  Plaintiff alleges that eyewitnesses positively identified Sanquan Carter and Orlando Carter.  *Id.*  On March 23, police arrested Sanquan Carter for Jordan Howe's murder.   Later that day, police responded to the United Medical Center to find Orlando Carter suffering from gunshot wounds.  *Id.* ¶ 37.  Orlando Carter allegedly reported to police that someone loyal to Howe might have shot him.  Orlando Carter was medevaced to Washington Hospital Center, where he was admitted in stable condition. Orlando Carter left the hospital "without police interference or objection," and allegedly called Jeffrey Best and told him to hide the weapons used in Howe's shooting.  *Id.*

Plaintiff alleges that "on March 23, 2010, officers of the [MPDC] and U.S Attorney Ronald Machen, Jr., had an opportunity to execute a search warrant of Orlando Carter's 'crash pad' apartment…, where it was believed the weapons used in the Howe shooting were located." *Id*. ¶ 38.  The plaintiff faults the MPDC and Machen for not seeking judicial authorization for a nighttime search and not staking out the apartment overnight.  *Id*.  Because of these actions, plaintiff alleges, by the time officers executed the warrant they "found nothing usable to obtain an arrest warrant for Orlando Carter."  *Id*.  On March 26, Chief of Police Cathy Lanier had an emergency meeting with Machen.  *Id*. ¶ 39.  At this meeting, Chief Lanier asked Machen for an arrest warrant for Orlando Carter; Machen refused, citing a lack of evidence.  *Id*.

On March 30, 2010, Brishell Jones attended funeral services for Jordan Howe.  *Id*. ¶ 40. After the funeral, Jones and a group of at least fifteen youths congregated outside a building at 4022 South Capitol Street SE, Washington, D.C.  That day, Orlando Carter rented a minivan, and—accompanied by Jeffrey Best, Robert Bost, and Nathaniel Simms—went looking for the people he felt responsible for his March 23rd shooting and Sanquan Carter's missing bracelet.[2] Seeking another gun to carry out the planned drive by, Jeffrey Best and Robert Bost killed Tavon Nelson in an attempt to steal Nelson's handgun.  Orlando Carter then drove the minivan to 4022 South Capitol Street; Best, Bost and Simms opened fire on the crowd.  The men fired weapons— including an AK-47 style assault rifle—used in the murder of Howe.[3]  *Id*.

Nine people were wounded; DeVaughn Boyd, William Jones, III, and Brishell Jones died.  *Id*. ¶¶ 41, 43, 45.  Jones, sixteen-years-old, died of a gunshot wound to the head.  *Id*. ¶ 44. Three ambulances were dispatched to the scene; plaintiff claims that the "ambulance closest to

---

[2]    Sanquan Carter was still in custody for the murder of Jordan Howe during the retaliatory drive by, and therefore did not directly participate in these shootings.  *See* Duggan & Hermann, *Long Sentences*, *supra* at B5.

[3]    Lamar Williams was not present at the drive by, but was convicted for providing Orlando Carter with the assault rifle used in the attacks.  *See* Duggan & Hermann, *Long Sentences*, *supra* at B5.

the scene…was the last to arrive," because "[i]nstead of dispatching to the scene when it first received the emergency call, the ambulance operators chose to run personal errands." *Id.* ¶ 42. MPDC officers arrested Orlando Carter and Nathaniel Simms after a vehicular pursuit; police later arrested Jeffery Best, Robert Bost and Lamar Williams. *Id.* ¶¶ 22–23, 46, 49.

Plaintiff's Complaint lists fourteen counts: (1) § 1983 claim for violations of substantive and procedural due process, *id.* ¶¶ 50–56; (2) wrongful death, survival, and loss of consortium, *id.* ¶¶ 57–68; (3) gross negligence and negligence, *id.* ¶¶ 69–82; (4) state-created and reckless endangerment/deliberate indifference, *id.* ¶¶ 83–88; (5) egregious incompetence, *id.* ¶¶ 89–97; (6) equal protection violations, *id.* ¶¶ 98–102; (7) race discrimination, *id.* ¶¶ 103–105; (8) executive abuse of authority/power, *id.* ¶¶ 106–107; (9) failure to supervise and notify in violation of Mandatory Juvenile Public Safety Notification Act, *id.* ¶¶ 108–15; (10) violation of D.C. Code § 16-2332 (d-1)(1), *id.* ¶¶ 116–18; (11) failure to enforce D.C. gun and ammunition laws, *id.* ¶¶ 119–24; (12) failure to enforce state and federal housing authority regulations, *id.* ¶¶ 125–26; (13) fraud, waste and misuse of federal funds, *id.* ¶¶ 127–28; and (14) intentional infliction of emotional distress, *id.* ¶¶ 129–30. Plaintiff seeks two hundred and twenty million dollars ($220,000,000.00) in compensatory and punitive damages. *Id.* at 44–45.

After carefully considering the plaintiff's Complaint, documents incorporated therein, and the parties' briefs, the Court will grant in part and deny in part defendants' motion to dismiss. Defendants asked the Court to dismiss all claims against Chief of Police Cathy Lanier and the District of Columbia with prejudice. *See* Proposed Order for Defs.' Mot. Dismiss, Mar. 27, 2012, ECF No. 22. However, the general rule is that when a Court dismisses a count for failing to state a claim under Federal Rule 12(b)(6), it does so without prejudice to refile and with leave to amend the complaint. When amendment would be futile—such as when plaintiff

bases claims on non-existent causes of action—dismissal *with* prejudice may be appropriate. Following these principles, the Court will take the following actions:  It will dismiss all claims against Cathy Lanier in her individual capacity without prejudice, and dismiss all claims against Cathy Lanier in her official capacity with prejudice.   It will dismiss plaintiff's request for punitive damages from the District of Columbia without prejudice.   It will dismiss plaintiff's claims against the District of Columbia under Counts Five, Eight, Nine, Ten, Eleven, Twelve, and Thirteen with prejudice.   It will dismiss plaintiff's claims against the District of Columbia under Counts One, Four, and Six without prejudice.   It will dismiss plaintiff's Title VII claim under Count Seven with prejudice, and dismiss plaintiff's D.C Human Rights Act claim under Count Seven without prejudice.   It will dismiss plaintiff's claims against the District of Columbia under Counts Two, Three, and Fourteen without prejudice—except to the extent those claims relate to the conduct of the ambulance operators closest to the scene who allegedly ran personal errands.  *See* Compl. ¶ 42.  The Court will deny the District of Columbia's request to dismiss plaintiff's claims under Counts Two, Three, and Fourteen insofar as those claims relate to the alleged misconduct of the ambulance operators.

The Court will grant the plaintiff leave to file an amended complaint within thirty days. The Court will hold any discovery in abeyance until the plaintiff has had an opportunity to amend its complaint, and defendants have had an opportunity to file a second motion to dismiss, if warranted.  This allows discovery to proceed on all surviving matters in a uniform manner, in the interests of judicial economy.  This would also allow the Court—if no federal claims or diverse parties remain—to transfer the case back to Superior Court.

## II.      LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the…claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).   In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations.  *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994).

While the court must construe the complaint in the plaintiff's favor, it "need not accept inferences drawn by the plaintiff[] if such inferences are unsupported by the facts set out in the complaint."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).   Moreover, the court is not bound to accept the legal conclusions of the non-moving party.  *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997).   The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n. 6 (D.C. Cir. 1993).   Factual allegations in briefs or memoranda of law may not be considered when deciding a Rule 12(b)(6) motion, particularly when the facts they contain contradict those alleged in the complaint.  *Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994); *cf. Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (when a motion to dismiss is based on the complaint, the facts alleged in the complaint control).

When a court dismisses a claim, typically it does so without prejudice to refile or amend the complaint. *O'Donnell v. Barry*, 148 F.3d 1126, 1137 n.3 (D.C. Cir. 1998) ("'[A] dismissal under Rule 12(b)(6) generally is not final or on the merits and the court normally will give plaintiff leave to file an amended complaint.'") (quoting WRIGHT, MILLER & KANE, 5A FEDERAL PRACTICE & PROCEDURE § 1357 at 360–61 (1990)). A "complaint that omits certain essential facts and thus fails to state a claim warrants dismissal pursuant to Rule 12(b)(6) but not dismissal with prejudice." *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006). This gives the complainant another opportunity to allege facts that would properly sustain a cause of action, and is in line "with the preference expressed in the Federal Rules of Civil Procedure…for resolving disputes on their merits." *Krupski v. Costa Crociere S.p.A*, 130 S. Ct. 2485, 2494 (2010).

However, a court should also consider Rule 1's directive that the Federal Rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. "Dismissal with prejudice is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (internal quotation marks omitted) (emphasis omitted). A district court does not abuse its discretion when it dismisses with prejudice claims for which amendment would be futile. *See, e.g.*, *Simpkins v. District of Columbia*, 108 F.3d 366, 370 (D.C. Cir. 1997) ("[T]o permit [plaintiff] to file another suit containing the same worthless claims would be inconsistent with the duty of lower federal courts to stop insubstantial *Bivens* actions in their tracks and get rid of them….Such lawsuits impose undue burdens on the officer being sued, and thus interfere with the operations of government."); *Baker v. Director, U.S. Parole Com'n*, 916 F.2d 725, 727 (D.C. Cir. 1990) (upholding *sua sponte* dismissal with prejudice when "patently obvious that

[plaintiff] could not have prevailed on the facts alleged in his complaint" and "apparent that the claimant could not possibly prevail"); *Carty v. Author Solutions, Inc.*, 789 F. Supp. 2d 131, 135–36 (D.D.C. 2011) (dismissal with prejudice appropriate when permitting amendment would be futile because "amended complaint would suffer from the same flaw as the original complaint").

## III.    ANALYSIS OF CLAIMS AGAINST CHIEF OF POLICE CATHY LANIER

Plaintiff sued many government officials in both their individual and official capacities, Compl. 1–4, among them Cathy Lanier, Chief of Police of the Metropolitan Police Department of the District of Columbia.  Since the facts do not support suing Chief Lanier in her individual capacity, and suing her in her official capacity would be redundant, the Court will dismiss all claims against Chief Lanier.  It will dismiss claims against Chief Lanier in her individual capacity without prejudice, and dismiss claims against her in her official capacity with prejudice.

### A.    Claims Against Chief Lanier in her Individual Capacity

#### 1.    *Chief Lanier Not Personally Involved in the Misconduct*

The plaintiff may bring a claim against Chief Lanier in her individual capacity if the plaintiff alleges Chief Lanier "was directly responsible for the constitutional deprivation or that [s]he gave 'authorization or approval of such misconduct.'"  *Ekwem v. Fenty*, 666 F. Supp. 71, 76 (D.D.C. 2009) (quoting *Int'l Action Center v. United States*, 365 F.3d 20, 27 (D.C. Cir. 2004)).  "Where a complaint against an official in h[er] individual capacity does not 'establish the [official]'s personal involvement in the alleged wrongdoing,' judgment as a matter of law is appropriate."  *Id.* (quoting *Swinson v. Metro Police Dep't*, No. 08-0809, 2009 WL 1327225, at *2 (D.D.C. May 12, 2009)).

No facts in the Complaint specify Chief Lanier's personal involvement in the alleged wrongdoing.  Even by the most generous reading, plaintiff's "effort to hold [Chief Lanier]

personally liable fades into *respondeat superior* or vicarious liability, clearly barred under Section 1983." *Int'l Action Ctr.*, 365 F.3d at 27. The plaintiff makes bare assertions that the MPDC and Chief Lanier "exercise[ed] a policy and custom based on discrimination against black youths wherein their safety or lives were not as valuable or protected as others," Pl.'s Opp'n to Defs.' Mot. Dismiss 12, and that they "would have responded differently, faster, and more effectively had the targeted community, victims, and witness been Caucasian and residing in other regions of the District," *id*. at 14. The plaintiff seeks to hold Chief Lanier personally liable for failing to act more diligently in "obtaining and executing search and arrest warrants, making multiple and expeditious arrests, [and] tracking and obtaining custody of all assault weapons used against the young people at the initial shooting on March 22, 2010." *Id.*

This does not show Chief Lanier's *personal* involvement "outside the mention of her official capacity as the Chief of Police who generally oversees all police activity." Defs.' Reply ISO its Mot. Dismiss 6.[4] In fact, the only part of the Complaint discussing Chief Lanier's personal involvement regards an emergency meeting Chief Lanier had with the U.S. Attorney about obtaining an arrest warrant for Orlando Carter. Compl. ¶ 39. If anything, this shows that Chief Lanier sought to protect the community. The plaintiff broadly claims that the MPDC and Chief Lanier's inaction contributed to Jones' death, but has "failed to link the likelihood of particular constitutional violations to any past transgressions, and failed to link [this] particular supervisor[] to those past practices or any familiarity with them. In the absence of such

---

[4]     The plaintiff claims that "Chief Lanier's actions consist of ordering and directing: the investigation of multiple shootings…; seeking and executing the search and arrest warrants requisite for the resolution of the first heinous and related shootings; interviewing witnesses; detaining the Carter brothers and their accomplices; issuing statements to the press, media, and community; and other acts to be uncovered through discovery." Pl.'s Opp'n to Defs.' Mot. Dismiss 18. The plaintiff does not allege Chief Lanier *personally* directed the investigations, interviewed witnesses, et cetera. The allegation is that "[g]iven Lanier's position as Chief [ ], her final decision-making authority, knowledge, coordination, and involvement in deliberate police in regard to the [p]laintiff's claims and allegations are inherent in her position as Chief." *Id.* This is exactly the kind of attempt to hold an official vicariously liable that Section 1983 forbids. *Cf. Int'l Action Ctr.*, 365 F.3d at 27.

'affirmative links,' [Chief Lanier] cannot be shown to have the requisite 'direct responsibility' or to have given '[her] authorization or approval of such misconduct[.]'" *Int'l Action Ctr.*, 365 F.3d at 27 (quoting *Rizzo v. Goode*, 423 U.S. 362, 370 (1976)).

### 2.   Chief Lanier has Absolute Immunity from Individual Liability for Plaintiff's Common Law Causes of Action

Based on the facts alleged, absolute immunity would bar the plaintiff's common law claims.  Under *District of Columbia v. Thompson* (*Thompson I*), 570 A.2d 277 (D.C. 1990) "a federal official engaged in a discretionary act within the 'outer perimeter of [the official's] line of duty' is absolutely immune from suit," *id.* at 294 (quoting *Barr v. Matteo*, 360 U.S. 564, 575 (1959)).  Courts in the District extend this absolute immunity to officials working in the United States and District of Columbia governments.  *See*, *e.g.*, *Moss v. Stockard*, 580 A.2d 1020 (D.C. 1990) (extending absolute immunity to Athletic Director of University of the District of Columbia); *Kendrick v. Fox Television*, 659 A.2d 814, 819 (D.C. 1995) (absolute immunity bars common law suit against MPDC Deputy Chief of Police).  Actions that "have more or less connection with the general matters committed by law to his control or supervision" fall within the "outer perimeters" of the official's duties.  *Moss*, 580 A.2d at 1020.  "The reason why absolute immunity is available for discretionary official acts is clear: to ensure that when public officials exercise discretion in carrying out their duties, concern about tort liability will not inhibit the 'fearless, vigorous and effective administration of policies of government.'" *Kendrick*, 659 A.2d at 819 (quoting *Thompson I*, 570 A.2d at 295).

The plaintiff does not allege facts showing Chief Lanier acted beyond the outer perimeters of her official duties.  The decisions she made investigating the earlier shooting, obtaining search and arrest warrants, and directing police resources clearly fall within her official duties.  The plaintiff admits as much when she claims Chief Lanier's involvement in the

investigation and policies are "inherent in her position as Chief." Pl.'s Opp'n to Defs.' Mot. Dismiss 18. The "complaint alleges that the Chief was acting within the scope of her employment and as an agent for the District of Columbia," *id.,* and does not allege that Chief Lanier acted outside the scope of her employment to harm plaintiff.

In determining whether an action is "discretionary" or "ministerial," a court balances "society's concern to shield the particular government function at issue from the disruptive effects of civil litigation" against "the vindication of private injuries otherwise compensable at law." *Moss*, 580 A.2d at 1021. In striking this balance, the court should consider:

> (1) the nature of the plaintiff's injury, (2) the availability of alternative remedies, (3) the ability of the court to judge fault without unduly invading the executive function, and (4) the importance of protecting particular kinds of official acts.

*Id*. While plaintiff's injury is serious, alternative remedies are available. The plaintiff may file a wrongful death suit against the persons directly responsible for Jones' death—her murderers.[5] The third and fourth factors counsel strongly in favor of finding Chief Lanier's actions discretionary. Courts are appropriately uneasy about second-guessing the judgment of police officials. *See*, *e.g.*, *Kendrick*, 659 A.2d 820 (expressing worry about "second-guessing details of judgments police officials have to make in conducting sensitive and difficult investigations…. Court scrutiny…where public safety issues are implicated, is likely to be overly intrusive, amounting to an invasion of the executive function that *Thompson I* indicates should be avoided."); *Morgan v. District of Columbia*, 468 A.2d 1306, 1311 (D.C. 1983) ("[T]he public interest is not served 'by allowing a jury of lay [persons] with the benefit of 20/20 hindsight to

---

[5]    A wrongful death suit is an adequate alternative legal remedy—plaintiff would be entitled to a wide range of compensatory damages from Jones' killers. This legal remedy may be superior, as plaintiff could recover punitive damages from the killers, where she could not recover punitive damages from the District. *See supra* Part III.A. Plaintiff may argue that such a wrongful death suit may be *legally* adequate, but not *practically* adequate, as it is unlikely that plaintiff will recover $220,000,000.00 from the killers. However, the mere fact that the government, and its officials, may have deeper pockets does not mean that individual liability should attach.

second-guess the exercise of a police [officer]'s discretionary professional duty.'") (quoting *Shore v. Town of Stonington*, 444 A.2d 1379, 1384 (Conn. 1982)).  The actions Lanier took as Chief of Police "require[d] personal deliberation, decision and judgment" and are thus "[d]iscretionary acts[.]"  *Nealon v. District of Columbia*, 669 A.2d 686, 690 (D.C. 1995). Considering the nature of Chief Lanier's actions—as alleged in the Complaint—the Court would be unable to "judge fault without unduly invading the executive function[.]"  *Moss*, 580 A.2d at 1021.  Therefore, her actions were discretionary and fell within the outer perimeters of her official duty.  Chief Lanier would be absolutely immune from individual liability for plaintiff's common law claims.

### 3.    Chief Lanier has Qualified Immunity from Individual Liability for Plaintiff's Statutory and Constitutional Causes of Action

Chief Lanier would also enjoy qualified immunity from individual liability for plaintiff's constitutional and statutory claims.  "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity mitigates the "social costs [of] the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office."  *Id.* at 814.  It is appropriate to raise issues of qualified immunity in a motion to dismiss.  "Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive….[W]e repeatedly have stressed the importance of resolving immunity questions are the earliest possible stage in the litigation."  *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001).

Qualified immunity protects Chief Lanier from personal liability for conduct she would not have reasonably known violated the Constitution or a statute. *Saucier*, 533 U.S at 202. To be liable, Chief Lanier would have had to violate a "clearly established" constitutional or statutory right. *Id.* ("'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'") (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Wilson v. Layne*, 526 U.S. 603, 6015 (1999). Chief Lanier is immune "as long as [her] actions could reasonably have been thought consistent with the rights [she is] alleged to have violated." *Anderson*, 483 U.S. at 638.

The facts alleged by plaintiff do not show how Chief Lanier acted in violation of a clearly established constitutional or statutory right. First, as discussed *supra*, the plaintiff alleges little about Chief Lanier's personal involvement—apart from her supervisory role, and her meeting with Machen—in the investigation or alleged rights violations. Second, the plaintiff relies on conclusory statements that Chief Lanier "had a clear obligation…to provide Brishell Jones and other intended victims with equal protection of the laws, to not discriminate against African American youths, and to provide them with the same protection and value for their lives as those similarly situation but of a different race." Pl.'s Opp'n to Defs.' Mot. Dismiss 20–21. But other than further circular assertions that Chief Lanier would have treated the case differently if the victims were White, *see id.* at 14, the plaintiff does not allege facts showing Chief Lanier violated a clearly established constitutional or statutory right.[6] "[B]are allegations of malice

---

[6]   When taken at a very macro level, the rights at issue might be "clearly established." Certainly, it is clearly established that the government "cannot deprive any person of life…without due process of law." U.S. Const. amend. XIV § 1. It is also clearly established that the government cannot "deny to any person…the equal protection of the laws" because of their race. *Id*; *see* Pl.'s Opp'n to Defs.' Mot. Dismiss 21 (citing Fourteenth Amendment's Due Process and Equal Protection Clauses as clearly established constitutional rights Chief Lanier violated). However, the *particular* violations alleged are not clearly established. It is not clearly established that the kind of discretionary police judgments made by Chief Lanier violated any individual's due process rights. It is not clearly

should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery[.]" *Harlow*, 457 U.S. at 817–18.  Chief Lanier is entitled to qualified immunity from all of plaintiff's constitutional and statutory causes of action.

The plaintiff has failed to allege facts that Chief Lanier personally participated in the alleged wrongdoing, apart from actions she took within the scope of her employment.  Based on her actions, as alleged in the Complaint, Chief Lanier enjoys absolute immunity from all plaintiff's common law claims, and qualified immunity from all plaintiff's constitutional and statutory claims.  Thus, the Court will dismiss without prejudice all claims against Chief Lanier in her individual capacity.

### B.       Claims Against Chief Lanier in her Official Capacity

The Court will also dismiss all claims made against Chief Lanier in her official capacity. A suit against a District of Columbia official in her official capacity is "equivalent to a suit against the municipality itself." *Atchinson v. District of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996).  The Supreme Court has explained that "[o]fficial-capacity suits…[g]enerally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  Courts in the District of Columbia frequently dismiss claims against individuals named in their official capacity as "redundant and an inefficient use of judicial resources." *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 49 (D.D.C. 2005); *see also Jenkins v. Jackson*, 538 F. Supp. 2d 31, 33–34 (D.D.C. 2008).

The District of Columbia is a named defendant who has received proper notice. Therefore, the claims against Chief Lanier in her official capacity are redundant, inefficient and should be dismissed.  Plaintiff concedes redundancy, but states that "there is no requirement that,

---

established that the statutes plaintiff cites as establishing a "special relationship" between the government and Jones create any actionable, individual rights.

because of the equivalence, the public official defendant must be dismissed." Pl.'s Opp'n to Defs.' Mot. Dismiss 17. This provides no reason to keep the redundant claims, and amendment would be futile. The Court will dismiss all claims made against Chief of Police Cathy Lanier in official capacity with prejudice.

## IV.    ANALYSIS OF CLAIMS AGAINST THE DISTRICT OF COLUMBIA

By dismissing Chief of Police Cathy Lanier as a defendant to this action, the Court will treat all claims made against Chief Lanier in her official capacity as claims against the District itself. The Court has previously dismissed claims against various D.C. government agencies, including the Department of Youth Rehabilitation Services, Metropolitan Police Department, and D.C. Fire and Emergency Medical Services. *See* Orders Granting Mots. Dismiss, ECF Nos. 18, 20, 21. A "noncorporate department or other body within a municipal corporation is not sui juris." *Braxton v. Nat'l Capital Hous. Auth.*, 396 A.2d 215, 216–17 (D.C. 1978). "Decisions from the District of Columbia Court of Appeals have consistently held that, in the absence of a statutory provision providing otherwise, bodies within the District of Columbia government are not suable as separate entities." *Hinton v. Metropolitan Police Dept., Fifth District*, 726 F. Supp. 875, 875 (D.D.C. 1989). Therefore, the Court will treat plaintiff's claims and allegations against District agencies as though they were directed at the District itself.

### A.    Plaintiff's Request for Punitive Damages from the District of Columbia

The plaintiff requests compensatory and punitive damages totaling two hundred and twenty million dollars ($220,000,000.00). Compl. 44–45. The Complaint does not disaggregate punitive damages from compensatory damages, but presents one total figure for each group of claims. *Id*. The defendants argue, "Punitive damages may not be awarded against the District of Columbia…absent an express statutory mandate." Defs.' Mem. ISO its Mot. Dismiss 6. Federal

and local courts in this jurisdiction have held that the District generally cannot be liable for punitive damages.  *See*, *e.g.*, *City of Newport v. Fact Concerts*, 453 U.S. 247, 260 n.21 (1981) ("The general rule today is that no punitive damages are allowed [against a municipality] unless expressly authorized by statute."); *Teart v. Washington Metro. Area Transit Auth.*, 686 F. Supp. 12, 13 (D.D.C. 1988) ("In the absence of express statutory authority, punitive damages are not recoverable against the District of Columbia."); *Finkelstein v. District of Columbia*, 593 A.2d 591, 599 (D.C. 1991) ("[P]unitive damages may not be awarded against the District of Columbia[.]"); *Smith v. District of Columbia*, 336 A.2d 831, 832 (D.C. 1975) (per curiam) ("The clear weight of authority in the states is that as a general rule there can be no recovery of punitive damages against a municipality absent a statute expressly authorizing it.").

Plaintiff counters that punitive damages are available against the District, absent statutory authority, if there are "'extraordinary circumstances.'"  Pl.'s Opp'n to Defs.' Mot. Dismiss 9 (quoting *Butera v. District of Columbia*, 235 F.3d 637, 658 (D.C. Cir. 2001).  Plaintiff does not allege any statute authorizes punitive damages against the District, but argues that "given the horrendous nature of Miss Jones' death…a reasonable jury could find that the allegations in [p]laintiff's complaint 'present circumstances upon which a reasonable jury might find the existence of 'extraordinary circumstances[.]'"  *Id*. at 11 (quoting *Butera*, 235 F.3d at 657).

Plaintiff's discussion of *Butera*, tellingly, omits the case's definition of "extraordinary circumstances."  The D.C. Circuit stated:

> The term "extraordinary circumstances" is a term of art in this context.  In *Daskalea v. District of Columbia*, 227 F.3d 433 (D.C. Cir. 2000), the court…clarified the meaning of "extraordinary circumstances" to refer to circumstances such as "where a jurisdiction's taxpayers are directly responsible for perpetrating the policies that caused the plaintiff's injuries" or "where a municipality or its policymakers have intentionally adopted the unconstitutional policies that caused the damages in question."  *Id*. at 447.

*Butera*, 253 F.3d at 657.  The plaintiff has alleged no facts that would show "that the District of Columbia policymakers intentionally adopted an unconstitutional policy," *id.*, or that the District's taxpayers are "directly responsible for perpetrating the policies that caused the plaintiff's injuries," *Daskalea*, 227 F.3d at 447.  Plaintiff emphasizes the magnitude of the harm and alleged misconduct, Pl.'s Opp'n to Defs.' Mot. Dismiss 9–11, but does not meet *Butera*'s specific, narrow meaning of "extraordinary circumstances."   Based on the facts alleged in the Complaint, plaintiff cannot recover any punitive damages from the District of Columbia, and the Court will dismiss plaintiff's request for punitive damages without prejudice.

### B.     Plaintiff's Common Law Claims Against the District of Columbia

#### 1.     *Claims Barred by Public Duty Doctrine (Counts Two and Three)*

In Count Two, plaintiff brings a wrongful death claim, alleging that "[t]he cause and circumstances under which Brishell [Jones] was murdered resulted directly and/or indirectly from an ongoing series of long and short term decisions, actions, and/or inactions rising to the level of noncompliance with state and federal law…, negligence and/or incompetence by…D.C. government agencies, their directors, agents, and employees."  Compl. ¶ 62.  The Complaint further alleges:

> As a result and proximate cause of the Defendants AUSA and D.C. government agencies', their Directors', agents', and employees' gross negligence, intentional disregard, and breach of their duties, their acts and omissions/ failures to act while working within the scope of their employment as the District's agents, servants, and/or employees caused Ms. Jefferies (and Mr. Jones) to be deprived of their smart, kind, and loving daughter[.]

*Id*. ¶ 63.  In Count Three, plaintiff brings negligence and gross negligence claims.  Plaintiff alleges that the District of Columbia and its officials, through a dereliction of their official duties and failure to enforce federal and District laws meant to protect the community, failed to prevent the killing of Jones.  *Id*. ¶¶ 69–82.  The Complaint states, "Pursuant to D.C. government

legislation, policies, customs, practices and strategy plans, Brishell Tashé Jones was a member of a statutorily protected class which triggered a 'special relationship' with and imposed an increased duty of care by Defendant D.C. government agencies, their directors, agents and employees including the D.C. Metropolitan Police Department and other law enforcement agencies." *Id.* ¶ 75. Plaintiff cites five "statutes, regulations, and administrative documents" as creating the necessary "special relationship": (1) D.C. Youth Development Strategy Implementation Plan, December 2005; (2) Mandatory Juvenile Public Safety Notification Amendment Act of 2006; (3) the Omnibus Public Safety Amendment Act 2009; (4) Enhanced Crime Prevention and Abatement Emergency Amendment Act of 2008; and (5) Records Access Emergency Amendment Act of 2009. *Id.*

The defendants insist that the public duty doctrine bars plaintiff's negligence claims, and plaintiff has shown that her claims fall under an exception to this doctrine. *See* Defs.' Mem. ISO its Mot. Dismiss 13–23. For the most part, the Court agrees, and will dismiss most of plaintiff's claims under Counts Two and Three without prejudice.

Under the public duty doctrine, the "[g]overnment and its agents are under no general duty to provide public services, such as police protection, to any particular citizen." *Warren v. District of Columbia*, 444 A.2d 1, 4 (D.C. 1981). The doctrine applies, *inter alia*, to "cases where individuals seek to hold the District liable for negligence or wrongful death because of a failure to protect a person." *Taylor v. District of Columbia*, 776 A.2d 1208, 1214 (D.C. 2001). "[A]s a general rule, there is no individual right of action for damages against the government for failure to protect a particular citizen from harm caused by the criminal conduct of another." *District of Columbia v. Harris*, 770 A.2d 82, 87 (D.C. 2001). "The doctrine operates to shield the District and its employees from liability arising out of their actions in the course of providing

public services…[and] applies in the case of such services as police and fire protection[.]" *Hines v. District of Columbia*, 580 A.2d 133, 136 (D.C. 1990). The D.C. Court of Appeals, in *Morgan v. District of Columbia*, 468 A.2d 1306 (D.C. 1983), explained the justification for the public duty doctrine, particularly as it applies to public safety and police judgments:

> [C]ourts have had occasion to consider, and to reaffirm, the various policies which have led the law to determine that the duty to prevent crime is a general duty owed to the public and, therefore, unenforceable by any one individual. Foremost is the practical realization that individuals, juries and courts are ill-equipped to judge considered legislative–executive decision[s] as to how particular community resources should be or should have been allocated to protect individual members of the public. Severe depletion of these resources could well result if every oversight, omission or blunder made by a police official rendered a state or municipality potentially liable in compensatory, let alone punitive damages. In effect, police officials would be placed in the position of insuring the personal safety of every member of the community, notwithstanding limited resources and the inescapable choices of allocation that must be made. Moreover, police officials who act and react in the milieu of criminal activity where every decision to deploy law enforcement personnel is fraught with uncertainty must have broad discretion to proceed without fear of civil liability in the unflinching discharge of their duties.… [T]he public interest is not served by allowing a jury of lay [persons] with the benefit of 20/20 hindsight to second-guess the exercise of a police [officer]'s discretionary professional duty. Such discretion is no discretion at all.
>
> Other practical considerations come to bear at the level of day-to-day law enforcement. If the police were held to a duty enforceable by each individual member of the public, then every complaint—whether real, imagined, or frivolous—would raise the spectre of civil liability for failure to respond. Rather than exercise reasoned discretion and evaluate each particular allegation on its own merits the police may well be pressured to make hasty arrests solely to eliminate the threat of personal prosecution by the putative victim. Such a result historically has been viewed, and rightly so, as untenable, unworkable and unwise. Furthermore, other effective mechanisms exist to control the behavior of errant police officials…. [O]n balance the community is better served by a policy that both protects the exercise of law enforcement discretion and affords a means of review by those who, in supervisory roles, are best able to evaluate the conduct of their charges.

*Id.* at 1311–12 (citations and internal quotation marks omitted). In essence, plaintiff's Complaint alleges that Jones' death was "preventable," Compl. ¶ 19, and the District had opportunities to

stop the chain of retaliatory violence, *id*. ¶¶ 33–40, but negligently failed to act, *id*. ¶¶ 69–81. The Complaint highlights the failure to arrest Orlando Carter at the hospital, *id*. ¶ 37, the failure to stake out or execute a nighttime search warrant at the "crash pad," *id*. ¶ 38, and the failure to obtain an arrest warrant for Orlando Carter sooner, *id*. The vast majority of plaintiff's factual allegations boil down to a claim that the District failed to prevent a crime. The public duty doctrine bars exactly this kind of "police negligence" claim.

The public duty doctrine determines when the District or its officials have a duty to a particular person, rather than the public at large. *See Warren*, 444 A.2d at 4. The doctrine, therefore, resolves whether the government owed any duty of care to the plaintiff or decedent. If, based on reading the Complaint, the public duty doctrine applies, the Court may appropriately dismiss the tort claims under 12(b)(6) for failing to state a claim. *See id*. at 1 (affirming trial judges' holdings "that the police were under no specific legal duty to provide protection to the individual appellants" and affirming dismissals of "complaints for failure to state a claim upon which relief could be granted" under local analogue to Rule 12(b)(6)).

The Court must consider whether some exception applies. "Under the public duty doctrine, a person seeking to hold the District of Columbia liable for negligence must allege and prove that the District owed a special duty to the injured party, greater than or different from any duty which it owed to the general public." *Klahr v. District of Columbia*, 576 A.2d 718, 719 (D.C. 1990). Plaintiff may establish such a special relationship or duty by demonstrating either "direct contact or continuing contact between the victim and the governmental agency or official," or that a statute prescribes "mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole." *District of Columbia v. Forsman*, 580 A.2d,

1314, 1317 (D.C. 1990).   "The threshold for establishing a special relationship is very high." *Trifax Corp. v. District of Columbia*, 53 F. Supp. 2d 20, 30 (D.D.C. 1999).

Under the first exception to the public duty doctrine, plaintiff must "allege and prove two things: (1) a direct or continuing contact between [the plaintiff] and a governmental agency or official, and (2) a justifiable reliance on the part of [the plaintiff]." *Klahr*, 576 A.2d at 720. "The required contact must…be a 'direct transaction with the party injured or an arms-length relationship in which the city's agent is dealing directly, in some form, with the person injured.'" *Powell v. District of Columbia*, 602 A.2d 1123, 1130 (D.C. 1992) (quoting *City of Tampa v. Davis*, 226 So.2d 450, 454 (Fla. Dist. Ct. App. 1969)).   "Moreover, the government must engage in 'affirmative undertaking' of protection on which the victim justifiably relies." *Taylor*, 776 A.2d at 1215 (quoting *Morgan*, 468 A.2d at 1317–18).   "Affirmative negligence" is required, as opposed to "inaction or futile action."   *Johnson v. District of Columbia*, 580 A.2d at 142, 143 (D.C.1990) (quotation omitted).   The plaintiff must show a "justifiable reliance on a specific undertaking to render aid." *Hines*, 580 A.2d at 138.

The Complaint does not allege there were *any* contacts between District officials and the plaintiff or decedent, other than the "contact" between the ambulance operators and Ms. Jones. *See* Compl. ¶ 42.   The Court examines the conduct of ambulance operators separately, in the following section.   Nothing else in the Complaint alleges a "direct transaction with the party injured or an arms-length relationship in which the city's agent is dealing directly, in some form, with the person injured." *Powell*, 602 A.2d at 1130.   Even if there were some contact between the government and plaintiff, the Complaint says nothing about justifiable reliance.   There is a high burden for showing justifiable reliance:

> Justifiable reliance, in this context, means particular or special reliance.   The definition could not be otherwise.   In a civilized society, every citizen at least

> tacitly relies upon the constable for protection from crime.  Hence, more than general reliance is needed to require the police to act on behalf of any particular individual.  The plaintiff must specifically act, or refrain from acting, in such a way as to exhibit particular reliance upon the actions of the police in providing personal protection.

*Morgan*, 468 A.3d at 1315 (citations omitted).  The plaintiff has pled nothing about particular or special reliance.  Most of plaintiff's allegations under Counts Two and Three cannot proceed under this exception to the public duty doctrine.

The second exception to the public duty doctrine involves a specific statute or regulation that prescribes "mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole."  *Turner v. District of Columbia*, 532 A.2d 662, 667 (D.C. 1987).  "[I]f a state agency is required by statute or regulation to take a particular action for the benefit for a particular class and fails to do so, or negligently does so, and the plaintiffs justifiably rely to their detriment on the agency's duty to act, a cause of action in negligence will lie against the state or its agency."  *Id.* at 672.  In *Turner*, for example, the D.C. Court of Appeals found that the Child Abuse Prevention Act imposes "upon certain public officials specific duties and responsibilities which are intended to protect a narrowly defined and otherwise helpless class of persons: abused and neglected children."  *Id.* at 668.  The Child Abuse Prevention Act mandates that District officials act in certain ways to protect a special class, and when officials breach those duties, "that statutorily protected class suffers in a way uniquely different from the public at large."  *Id.*  In the present case, plaintiff lists five "statutes, regulations, and administrative documents" as supporting a statutory exception to the public duty doctrine.  Compl. ¶ 75.  None create any duty of care owed by the District of Columbia or its agents to Brishell Jones, and none can support an exception to the public duty doctrine.[7]

---

[7]    In her Opposition, plaintiff relies heavily on *Florence v. Goldberg*, 44 N.Y.2d 189 (1978), a New York Court of Appeals case that found that a special relationship existed because "the police department voluntarily assumed a

First, the plaintiff cites the "D.C. Youth Development Strategy Implementation Plan, December 2005" as creating a "special relationship" with African American youths in Wards 7 and 8. *Id.* The Youth Development Strategy Plan was not a statute or official regulation, but represents a "police–community partnership…formed to reduce violence in communities east of the Anacostia River through law enforcement, conflict resolution, and intervention and prevention strategies." *Id.* ¶ 32. "To address safety issues, [MPDC] agreed to meet with the [Violence Intervention Partnership] members monthly[.]" *Id.* This partnership does not carry the force of law, or require government officials to act in any particular way, so it cannot create the "special relationship" required under *Turner*. *See also Morgan*, 486 A.2d at 13178–18 (matters of general police procedure cannot create special duty to protected class). Plaintiff relies on *Florence v. Goldberg*, 44 N.Y.2d 189 (1978), where the New York Court of Appeals held that a police officer's voluntary undertaking of a duty to supervise a school crossing made him liable when he negligently performed that duty, and an injured child's mother acted in reliance on that duty, *id.* at 196–97 (cited in Pl.'s Opp'n to Defs.' Mot. Dismiss 27–30). However, as discussed in *supra* note 6, D.C. courts have frequently distinguished *Florence* on its facts. *See, e.g., Hines*, 580 A.2d at 138–40; *Stoddard*, 623 A.2d at 1153–54. Plaintiff does not explain what specific duties the Youth Development Strategy Plan imposed, and how the District breached those duties. Plaintiff claims District "[a]gencies decreased participation and stopped attending" monthly meetings with community groups. Compl. ¶ 32. It is not clear that the Plan required D.C. officials to attend these meetings, or how this "breach" could have been a

---

particular duty to supervise school crossings," *id.* at 196 (cited in Pl.'s Opp'n to Defs.' Mot. Dismiss 27). Courts in the District of Columbia have "read *Florence* to state that an exception to the public duty doctrine arises from the combination of (1) a specific undertaking by a government agent to provide help or protection to a specific individual or group and (2) that individual's resulting particularized and justifiable reliance." *Hines*, 580 A.2d at 139. While adopting some principles from *Florence*, D.C. courts applying D.C. law have repeatedly distinguished the facts of *Florence*, and favor citing directly to D.C. cases applying and developing the public duty doctrine. *See*, *e.g.*, *Hines*, 580 A.2d at 138–40; *Stoddard v. District of Columbia*, 623 A.2d 1152, 1153–54 (D.C. 1993).

proximate cause of plaintiff's injuries.  Furthermore, plaintiff does not allege how she, or the decedent, relied on the Youth Development Strategy Plan to her detriment.  The Plan cannot support a "special relationship" exception to the public duty doctrine.

Second, the plaintiff cites the Mandatory Juvenile Public Safety Notification Amendment Act of 2006.  Compl. ¶ 75.  For reasons discussed in greater detail in *infra* Part IV.C.1., the Act is for the protection of the public as a whole, and not for any particular class.  Furthermore, the plaintiff concedes in her Opposition that the Act was enacted "to keep D.C. residents out of harm's way," and therefore creates a "general public duty."  Pl.'s Opp'n to Defs.' Mot. Dismiss 31.  This Act cannot support a statutory exception to the public duty doctrine.

Third, the plaintiff cites the Omnibus Public Safety Amendment Act of 2009.  Compl. ¶ 75.  This Act is a large collection of amendments to the D.C. Official Code.  54 D.C. Reg. 7413 (Aug. 26, 2009).  The amendments, *inter alia*, establish new criminal offenses, redefine and repeal existing offenses, change sentence ranges, create working groups, extend administrative deadlines, clarify local rules of evidence and criminal procedure, and define statutory terms.  *Id*. The amendments cover a wide range of matters, including the destruction of campaign materials, the qualifications of the Chief Medical Examiner, disclosure of mental health information, establishing a gun-offender registry, exceptions to the physician–patient privilege, and texting while driving.  *Id*.  It is a classic example of a law meant for the benefit of all, and not a particular class.  Plaintiff did not respond in any way to defendants' argument that this law could not create an exception to the public duty doctrine.  *See* Defs.' Reply ISO its Mot. Dismiss 9–10. Since the Omnibus Public Safety Amendment Act of 2009 is for the protection of all, not a protected class, it cannot support a statutory exception to the public safety doctrine.

Fourth, the plaintiff cites the Enhanced Crime Prevention and Abatement Emergency Amendment Act ("ECPA") of 2006.[8]  Compl. ¶¶ 72, 75.  The stated purposes of the ECPA are:

> To amend, on an emergency basis, the Juvenile Curfew Act of 1995 to authorize the Mayor to modify curfew hours by issuing an executive order; to amend Title 16 of the…Official Code to require the Family Court…and the Director of the Department of Youth Rehabilitation Services ["DYRS"] to disclose specified information to the Chief of the Metropolitan Police Department; to require the Metropolitan Police Department to notify the Superintendent of the District of Columbia Public Schools of the filing of a petition against a student by the Office of the Attorney General for certain offenses and to disclose certain records relating to the charge; to amend Titles 23 and 16 of the…Official Code to create a rebuttable presumption for detaining certain adults and juveniles charged with robbery or certain handgun violations pending a trial or disposition hearing; to amend Chapter 25 of Title 24 of the District of Columbia Municipal Regulations governing the Metropolitan Police Department's Closed Circuit Television system to authorize its use in the prevention, detection, deterrence, and investigation of crime; to require the Mayor to make available to the Council certain Metropolitan Police Department records relating to the performance of officers, to provide biweekly crime briefings to the Council, and to submit to the Council a Crime Emergency Plan for each police district; to require the Mayor to conduct reviews of certain violations of persons who are on pre-trial release, parole, or probation, and to request that the United States Marshals' Service prioritize pending arrest and fugitive warrants for persons who have committed certain offenses; and to amend the Fiscal Year Budget Support Act of 2006 to require that the Metropolitan Police Department maintain the total percent of sworn officers assigned to the police districts as existed on June 11, 2006.

53 D.C. Reg. 6477 (July 21, 2006).  The ECPA does not single out any particular group for protection, but protects the public generally.  It only mandates a few actions.  It requires the Family Court and Director of DYRS to disclose specified information about violent or repeat offenders to the Chief of Police, and requires the MPDC to notify and share records with the School Superintendent when the Office of the Attorney General charges a student with a specified offense.  *Id.*  As discussed in greater detail in *infra* Part IV.C.1, mandating disclosure

---

[8]     The plaintiff refers to the "Enhanced Crime Prevention and Abatement Emergency Amendment Act of 2008" in paragraphs 1, 73 and 75 of the Complaint; but refers to the "Enhanced Crime and Abatement Emergency Act of 2006" in paragraphs 62, 66 and 72.  D.C. passed no law by that name in 2008, and the Court could not find any similarly named Act passed during 2008.  The features of the law—as described in the Complaint and plaintiff's Opposition to defendants' motion—match up with the 2006 Act.  *Compare* 543 D.C. Reg. 6477 (July 21, 2006) *with* Pl.'s Opp'n to Defs.' Mot. Dismiss 29–31.  Therefore, the Court will assume plaintiff meant to refer to the 2006 Act.

between government agencies protects the public rather than a specified class.  The EPCA requires the Mayor to submit crime prevention plans and disclose certain MPDC records and information to the City Council, and conduct reviews of certain violations of persons on pre-trial release.  53 D.C. Reg. 6477.  The Complaint does not allege that the District violated this part of the Act.  Furthermore, there is no indication that these provisions are designed to protect African American youths in Wards 7 and 8 in particular, rather than the public as a whole.  The ECPA requires additional budgeting to maintain the same percentage of sworn officers assigned to police districts as existed on June 11, 2006.  There is no allegation in the Complaint that the District violated this mandate, and there is no indication that protects a special class rather than the public as a whole.  For all these "mandatory actions," there are no facts suggesting that plaintiff or decedent justifiably relied on any statutory obligation to their detriment.

In particular, plaintiff alleges that the District failed to enforce the curfew in violation of the ECPA.  Compl. ¶ 33.  First, the EPCA does not mandate that the Mayor amend or enforce a curfew; it simply authorizes him to do so by executive order.  53 D.C. Reg. 6477.  A curfew imposes obligations on minors, not the government.  As plaintiff states in her Opposition, "On March 22, 2010 through and after March 30, 2010, the Juvenile Curfew Act of 1995…was in effect in the District, including Congress Heights, due to a determination by Defendant District of Columbia that there was a 'public safety necessity.'"  Pl.'s Opp'n to Defs.' Mot. Dismiss 30.  So even if the ECPA required the Mayor to impose a curfew, by plaintiff's omission the Mayor fulfilled that duty.  The "breach" plaintiff alleges is that Sanquan Carter violated his curfew when he shot Jordan Howe on March 22, 2010.  Compl. ¶ 33.  This is not a breach by a government official of any mandatory duty imposed by the ECPA.  It is a claim that the government failed to catch a criminal, prevent a crime—the type of claim barred by the public

duty doctrine. *See, e.g.*, *Powell*, 602 A.2d at 1215 (public duty doctrine generally "bar[s] lawsuits by a person seeking, as an individual, to enforce the duties to prevent crime and otherwise protect against injury"). Putting aside any problems with proximate causation—while Sanquan Carter violated curfew when he killed Howe, Orlando Carter and his crew were in compliance when they killed Ms. Jones around 7:30 p.m. on March 30, Compl. ¶¶ 40–41—the District has not violated any mandatory duty in failing to effectively enforce the curfew. By imposing a curfew, the District does not become the insurer of all those injured by a minor violating that curfew. *See, e.g.*, *Morgan*, 468 A.2d at 1311 ("In effect, police officials would be placed in the position of insuring the personal safety of every member of the community, notwithstanding limited resources and the inescapable choices of allocation that must be made."); *Walters v. Hampton*, 543 P.2d 648, 652 (Wash. Ct. App. 1975) (city cannot be made "insurer" against every harm posed by criminal act) (cited by *Morgan*, A.2d at 1311). Furthermore, there is nothing alleging that plaintiff or decedent ever relied on any aspect of the curfew to their detriment. Therefore, this statutory "duty" cannot support a finding of a "special relationship" under the ECPA.

The plaintiff also claims that "paragraph 6 of the [EPCA] allocates funding for the components of the DC's youth development and youth anti-violence strategies and emphasizes increased protection for court-involved youths." Pl.'s Opp'n to Defs.' Mot. Dismiss 30. The plaintiff continues: "DC City Council asked the CFO to authorize sufficient funding from the contingency reserve find to support mediation and peace-building initiatives in Wards 7 and 8." *Id*. The plaintiff quotes language, allegedly from the "Act," allocating:

> $75,000 (annual $300,000) to continue girl gang/crew mediation and peacebuilding initiative in Wards 5, 6, 7, 8. This involves peer mediation activities, summer employment opportunities, leadership development, and a retreat for gang/crew members.

28

*Id.*  There are many problems with this argument.  First, plaintiff raises this funding issue for the first time in her Opposition; nothing about it appears anywhere in the Complaint or Notice of Claim.  *Cf. Henthorn*, 29 F.3d at 688 (factual allegations in briefs or memoranda of law may not be considered when deciding 12(b)(6) motion).  Second—as far as this Court can tell—this language is *not* from the ECPA, as plaintiff claims.  The quoted language comes from an open letter from then-Mayor Anthony Williams to Linda Cropp, then-Chair of the D.C. Council.  *See* Mayor Anthony Williams, *The Mayor's Six-Step Proposal to Curb Crime*, WASH. POST, July 18, 2006, *available at* www.washingtonpost.com/wp-dyn/content/article/2006/07/18/ AR2006071800755_pf.html.  In the letter, Mayor Williams continued, "[W]hile I understand Council approval is not required to access these funds, I am requesting an affirmation of Council's support through a Sense of the Council resolution to allocate this funding as proposed."  *Id.*  Regarding money for gang/crew mediation, there is nothing to suggest that anything *required* funds be spent for this purpose.  There is absolutely no allegation that, even if there was some mandate, anyone violated this mandate.  The plaintiff makes no connection between this mediation and peacebuilding initiative and the events surrounding Jones' death.  No facts support justifiable reliance.  This cannot support any "special relationship" creating an exception to the public duty doctrine.  After considering all plaintiff's allegations and arguments, the Court finds plaintiff has not alleged facts that the District violated any mandatory provision of the ECPA designed for the special protection of a particular class.

Fifth and finally, plaintiff cites the Records Access Emergency Amendment Act of 2009. Compl. ¶ 75.  This Act does not mandate anything; it simply permits the Chairman of the Committee on Human Services or his designee to obtain records pertaining to youths in the custody of the DYRS.  56 D.C. Reg. 1939 (Mar. 6, 2009).  There is no indication that this Act

protects a particular group rather than the public as a whole.  The plaintiff has not alleged how plaintiff or the decedent relied to their detriment on this Act.  The plaintiff did not respond in any way to defendants' argument that this Act cannot support an exception to the public duty doctrine.  *See* Defs.' Reply ISO its Mot. Dismiss 9–10.  This law cannot establish a statutory exception or create a "special relationship."

After considering the applicability of the public duty doctrine to plaintiff's claims under Counts Two and Three, and any possible exceptions to that doctrine, the Court finds—based on the facts alleged in the Complaint—that plaintiff has, for the most part, failed to allege that the government owed any duty of care to plaintiff or the decedent.  It has also failed to allege facts that would support a finding that the District violated any duty owed, or that plaintiff justifiably relied to her detriment on any obligation assumed by the District.  Except for claims relating to the narrow facts discussed in the next section—plaintiff's allegation that ambulance operators ran personal errands instead of promptly responding, Compl. ¶ 42—plaintiff has failed to state a claim for relief.  The Court will dismiss the majority of plaintiff's claims against the District of Columbia under Count Two and Count Three without prejudice.

## 2. *Viable Claims under Count Two and Count Three*

While the public duty doctrine bars the vast majority of plaintiff's claims under Counts Two and Three, plaintiff states the basis for a claim that would survive a motion to dismiss in paragraph 42 of the Complaint.  Plaintiff alleges:

> [T]he ambulance driver closest to the scene that would have had the most impact on saving lives of the critically injured African American youths of Wards 7 and 8 was the last to arrive.  Instead of dispatching to the scene when it first received the emergency call, the ambulance operators chose to run personal errands.

If true—and taken with the inferences most favorable to the plaintiff—plaintiff could possibly recover under a theory of negligence and wrongful death from the District of Columbia.  The

District can be liable for the affirmative negligence of its emergency personnel.  *See*, *e.g.*, *Johnson v. District of Columbia*, 580 A.2d 140, 142–43 (D.C. 1990).  If the ambulance operators had a duty to the defendant to provide critical care, breached that duty by choosing to run personal errands rather than promptly responding to a dispatch, and because of this breach worsened Jones' condition, then the plaintiff might state a claim for negligence and wrongful death.  *Cf. Turner*, 532 A.2d at 666; *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C. 1984) (providing elements of cause of action for negligence).

The first question is whether the ambulance operators owed a duty of care to Jones.  This issue depends on the application of the public duty doctrine, as discussed in the previous section.  The defendants claim that "District law is clear," Defs.' Mem. ISO its Mot. Dismiss 17, citing *Hines v. District of Columbia*, 580 A.2d 122 (D.C. 1990) for the proposition that "the mere fact that an individual has emerged from the general public and becomes an object of the special attention of public employees does not create a relationship which imposes a special legal duty," *id*. (holding that public duty doctrine barred suit against District for failure of ambulance service to respond promptly to calls for help).  The next case defendants cite shows the issue is not so clear.  The D.C. Court of Appeals, in *Johnson v. District of Columbia*, 580 A.2d 140 (D.C. 1990), held that the public duty doctrine did not bar a common law damages suit against the District when the affirmative negligence of ambulance personnel worsened plaintiff's injuries, *id*. at 142–43; *see also Weeda v. District of Columbia*, 521 A.2d 1156 (D.C. 1987) (no indication that public duty doctrine bars action based on ambulance crew's negligent act of extricating plaintiff from wreckage of automobile if such extrication worsened plaintiff's injury).  Based on the most favorable reading of the Complaint, the operators' choice to run personal errands might constitute the kind of "affirmative negligence" needed to overcome the public duty doctrine.

31

This is not to say that the public duty doctrine will not eventually bar plaintiff's claims. The defendants may also have serious doubts about other aspects of this claim—i.e., can plaintiff prove the ambulance operators actually ran personal errands, can plaintiff establish actual and proximate causation.  To prevail, plaintiff eventually needs to show that if the ambulance had arrived sooner, Jones' condition would have been different.  But these issues are premature.  At this stage, the Court should avoid determining the substantive merits of the claim, or assessing the credibility of the factual allegations.  *Cf. Lyons v. Barrazotto*, 667 A.2d 314, 320 (D.C. 1995) ("When there is some evidence from which jurors could find the requisite elements of negligence, or when the case turns on disputed facts and the credibility of witnesses, the case must be submitted to the jury for determination.").  Plaintiff pled enough to avoid dismissal of Counts Two and Three regarding the alleged affirmative negligence of the ambulance operators.

### 3.  Plaintiff's Count Four Claim for Reckless Endangerment & Deliberate Indifference

In Count Four, plaintiff claims the District of Columbia and its agents have recklessly endangered Jones' life, and were deliberately indifferent to her constitutional rights.  Compl. ¶¶ 83–88.  The District of Columbia does not recognize the tort of "reckless endangerment," but the D.C. Circuit has

> join[ed] the other circuits in holding that, under the State endangerment concept, an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that ultimately results in the individual's harm.

*Butera*, 235 F.3d at 279.  Therefore, the Court will treat plaintiff's Count Four claim as falling under this "state endangerment concept" as recognized in *Butera*.[9]

---

[9]     The Court construes plaintiff's claims in Count Four to try to state a claim for relief, to avoid dismissing plaintiff's claims because of a technical fault in the pleading.  *Cf. Adams v. Bell*, 711 F.2d 161, 187 (D.C. Cir. 1983) ("[C]ourts must consider a request for relief if the plaintiff can succeed on any theory, whether advanced in the

Plaintiff has not alleged facts sufficient to state a claim under *Butera*, which states:

> The circuit courts have adopted the State endangerment concept in a range of fact patterns concerning alleged misconduct by State officials.  Regardless of the conduct at issue, however, the circuits have held that a key requirement for constitutional liability is affirmative conduct by the State to increase or create the danger that results in harm to the individual.  No constitutional liability exists where the State actors "had no hand in creating a danger but [simply] 'stood by and did nothing when suspicious circumstances dictated a more active role for them.'"  *Reed [v. Gardner*, 985 F.2d 1122, 1125 (7th Cir. 1993)] (quoting *DeShaney*, 498 U.S. at 203)….  Absent such affirmative conduct by the State to endanger an individual, courts have rejected liability under a State endangerment concept.

*Id*. at 277–78.  The plaintiff fails to allege that the D.C. government or its officials engaged in "affirmative conduct…to increase or create the danger that results in harm to the individual." *Id*. Instead, it is a classic case of government actors having "no hand in creating a danger" but simply standing by and doing "nothing when suspicious circumstances dictated a more active role for them," for which "[n]o constitutional liability exists[.]" *Id*. (internal quotation marks omitted).  It is clear that "a State's failure to protect an individual from private violence, even in the face of a known danger, 'does not constitute a violation of the Due Process Clause.'" *Id*. at 647 (quoting *DeShaney*, 489 U.S. 189, 197 (1989)).  The plaintiff has alleged *no* facts that the District of Columbia or its agents were actively involved in the series of violent acts leading to Jones' death.  The plaintiff claims the District's actions in investigating the earlier shootings and not apprehending suspects sooner contributed to Jones' death.  Compl. ¶¶ 83–88.  But these are not the kinds of "affirmative actions" covered by *Butera* and State endangerment; instead, they argue that the District failed to prevent violence, or was negligent in the face of a known danger.

---

complaint or not.").  As the Court construes plaintiff's Count Four claims, plaintiff asserts "State endangerment" and "deliberate indifference" claims against the District of Columbia.  These are not technically common law torts the same way plaintiff's Count Two, Three and Fourteen claims are, but are ways of attaching municipal liability under § 1983.  *See Butera v. District of Columbia*, 235 F.3d 637, 647–57 (D.C. Cir. 2001); *Gross v. District of Columbia*, 734 A.2d 1077, 1082–83 (D.C. 1999); *see also infra* Part IV.D.1 (discussing plaintiff's § 1983 claims).

The State endangerment doctrine does not create liability for this kind of inaction.  *See Butera*, 235 F.3d at 277–78 (collecting cases); *see also DeShaney*, 489 U.S. at 197.

Count Four also claims the District acted in deliberate indifference to plaintiff's constitutional rights.  Compl. ¶¶ 83–88.  Under *Gross v. District of Columbia*, 734 A.2d 1007 (D.C. 1999), municipal liability attaches for official acts "'taken with deliberate indifference as to its known or obvious consequences' with regard to violations of constitutional rights," *id*. at 1082 (quoting *Board of County Com'rs of Bryan County, Okl., v. Brown*, 520 U.S. 397, 407 (1997)).  "'A showing of simple or even heightened negligence will not suffice' to establish municipal liability for constitutional torts." *Id*. (quoting *Board of County Com'rs*, 520 U.S. at 407).  Conclusory accusations of racism, indifference, selective enforcement, and underenforcement, Compl. ¶¶ 26–27, 86–88, 99, cannot establish municipal policies that demonstrate a "deliberate indifference" to the life of Jones, or African American youths in general.  Stating that the District has a "policy" of not caring about Black people, *see id*, ¶ 99, is circular and does not constitute the well-pleaded facts necessary to state a claim.  *See*, *e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—'that the pleader is entitled to relief.'") (quoting Fed. R. Civ. P. 8(a)(2)).  The specific actions plaintiff cites are not sufficient to allege that the District was "deliberately indifferent" to Jones' life.  *See*, *infra* Part IV.D.1 (discussing failure of plaintiff to allege facts supporting finding of deliberate indifference under § 1983).  Therefore, plaintiff has failed to state a claim for deliberate indifference or State endangerment, and the Court will dismiss Count Four without prejudice.

### 4.     *Plaintiff's Count Fourteen Claim for Intentional Infliction of Emotional Distress*

In Count Fourteen, plaintiff alleges that the defendants "intentionally and/or recklessly caused Nardyne Jefferies severe emotional distress with their extreme and outrageous conduct resulted in the death of her only child, a death that could have been prevented." Compl. ¶ 130. The D.C. Court of Appeals provides the elements for intentional infliction of emotional distress:

> To establish a *prima facie* case of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress. *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) (quoting *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982)). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 n. 10 (D.C. 1994)). In general, "a case of intentional infliction of emotional distress is made out only if the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" *Homan*, *supra*, 711 A.2d at 818 (quoting RESTATEMENT (SECOND) OF TORTS § 46 (1965)). The question before us is whether an impartial jury could reasonably find that the defendants' conduct, as described by the plaintiff, and with all reasonable inferences drawn in the plaintiff's favor, was sufficiently outrageous to satisfy this concededly demanding standard.

*Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002).

> Plaintiff describes defendants' "outrageous" conduct as consisting of:

> D.C. government officials', agencies', employees' customs, discriminatory practices, culture of action and inaction, selective enforcement of responsibilities, failure to act based on D.C. law, agency regulations, and equal protection under state and federal law, irresponsible judgment and decision-making, willful disregard, deliverable indifference to the safety, welfare, and lives of African American youths in the District of Columbia, specifically the life of Brishell Jones on March 30, 2010[.]

Compl. ¶ 130. When the Court looks beyond how plaintiff characterizes the facts—and looks at the facts themselves—the District generally has not engaged in conduct that a reasonable juror could call "so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Homan*, 711 A.2d at 818. If plaintiff brought an emotional distress claim against Orlando Carter and his co-defendants, she might have a case. These men—in indiscriminately opening fire on a crowd of teenagers with an assault rifle—committed heinous acts. Brishell Jones' death was a true tragedy, and a reasonable juror could look at these events and exclaim "Outrageous!" *See id.*

Nevertheless, the question is not whether the drive by or Jones' death is appalling. The question is whether the District's actions that allegedly contributed to Jones' death were *themselves* appalling. When stripped of the gloss the Complaint puts on them, the facts alleged basically amount to: The District negligently failed to prevent a crime, and does not provide adequate police protection for African American youths. If true, this might be unsettling, but it would not support a finding that the District committed "extreme and outrageous conduct." *Larijani*, 791 A.2d at 44. Otherwise, police officers may be financially liable in tort whenever they fail to prevent a heinous crime. *See*, *e.g.*, *Morgan*, 468 A.2d at 1311–12. The standard for finding conduct "sufficiently outrageous" is "demanding." *Id.* The Court must dismiss the majority of plaintiff's Count Fourteen claim without prejudice.

The District is not entitled to complete dismissal of Count Fourteen. Plaintiff claims the closest ambulance did not arrive immediately, as the dispatchers chose to run personal errands. Compl. ¶ 42. If true, it is possible that a jury could find this conduct constitutes "extreme and outrageous conduct" which recklessly caused "plaintiff severe emotional distress." *Larijani*, 791 A.2d at 44. The Court will not dismiss Count Fourteen insofar as it covers the actions of the ambulance operators as described in paragraph 42 of the Complaint.

### C.      Plaintiff's Statutory Claims Against the District of Columbia

Plaintiff alleges the District violated or failed to enforce several statutes, contributing to Jones' death.  Compl. ¶¶ 103–26.  For many claims, plaintiff has no private right of action to enforce these laws.  For the Count Seven racial discrimination claim, plaintiff has failed to allege facts sufficient to state a claim under Title VII or the D.C. Human Rights Act.  The Court will dismiss with prejudice all plaintiff's statutory claims against the District under Counts Nine, Ten, Eleven and Twelve.  It will dismiss with prejudice plaintiff's Title VII claim under Count Seven, and dismiss without prejudice plaintiff's D.C. Human Rights Act claim under Count Seven.

### 1.      *Statutory Claims without an Explicit Private Right of Action (Counts Nine, Ten, Eleven and Twelve)*

Plaintiff's Counts Nine through Twelve allege that the District of Columbia violated or failed to enforce several municipal and federal laws, contributing to Jones' death.  None of the statutes mentioned therein explicitly create a private right of action.  The Court must determine whether any of these laws create an implied private right of action; none do, so the plaintiff cannot maintain a cause of action against the District for violating these laws.

The D.C. Court of Appeals, in *Coates v. Elzie*, 768 A.2d 997, 1001 (D.C. 2001), listed the factors "relevant to the question whether a state law creates an implied cause of action":

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted"…?  Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? … Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

*Id.* at 1001 (quoting *In re D.G.*, 83 A.2d 160, 166 (D.C. 1990) (quoting *Cort v. Ash*, 422 U.S. 66, 78 (1975) (emphasis by Supreme Court))).  "The burden is on the [plaintiff] to demonstrate that, in spite of any explicit authorization, the D.C. Council intended to imply a right to sue for

damages for violations" of the law at issue. *Id.*; *see also Suter v. Artist M.*, 503 U.S. 347, 363–64 (1992); *Fountain v. Kelly*, 630 A.2d 684, 690 (D.C. 1993).

A Rule 12(b)(6) motion "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). It is appropriate for this Court to determine, as a purely legal matter, whether there are any implied private rights of action. Not only does the Complaint fail to allege any facts that could support implied causes of action, but the plaintiff's Opposition fails to respond—in any way—to the "defendants' argument that none of these statutes creates a private cause of action for plaintiff." Defs.' Reply ISO its Mot. Dismiss 12.

In Count Nine, plaintiff alleges that the District's Department of Youth and Rehabilitation Services failed to adequately monitor Sanquan Carter after his release from custody and failed to notify the MPDC Chief of Police of Sanquan Carter's post-release assignment and placement. Compl. ¶¶ 110–13. Plaintiff claims that DYRS' failure to monitor and notify violated the Mandatory Juvenile Public Safety Notification Act of 2006 ("MJPS"), and allowed Sanquan Carter to set off the chain of events leading to Jones' death. *Id.* ¶ 113.

The MJPS creates no explicit private right of action, and none should be implied. The plaintiff claims the City Council enacted the MJPS to protect the safety of African American youths. Compl. ¶ 75. While public safety—and the safety of young people in particular—might have been a driving force behind the MJPS, the same can be said about virtually any police regulation. When police agencies operate more efficiently, it furthers their mission to protect and serve the public. Therefore, the first *Coates* factor is not dispositive.

The second and third *Coates* factors weigh strongly against implying a private right of action. Neither the text of the MJPS nor the facts in the Complaint show a "legislative intent to either create or deny a remedy." *Coates*, 768 A.2d at 1001. The MJPS has enforcement

language, but only for unauthorized disclosures of information. *See* 54 D.C. Reg. 866 (Feb. 2, 2007). The Supreme Court has been very hesitant to imply a new private right of action when a statute contains other enforcement mechanisms. *See Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571 (1979) ("Section 9(e) of the 1934 Act also expressly provides a private right of action. Obviously, then, when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly.") (citations omitted). When the rest of the statute reveals no intent to imply a private right of action, the inclusion of an alternative enforcement mechanism tips the scales. Furthermore, it would not be "consistent with the underlying purposes" of the MJPS "to imply such a remedy for the plaintiff." *Coates*, 768 A.2d at 1001. While the indirect purpose of many police regulations is to protect the public, specifically the MJPS governs the sharing of information between government agencies. *See* 54 D.C. Reg. 864–67. It seems *very* unlikely that the District meant to hold itself financially liable to crime victims whenever agencies failed to follow the information-sharing procedures of the MJPS.

In Count Ten, plaintiff alleges that the District and its agencies failed to inspect, analyze, and share Sanquan Carter's juvenile records in violation of D.C. Code § 16-2332(d-1)(1). Compl. ¶¶ 116–18. This section of the D.C. Code—since repealed—was added to the Code by the MJPS. *See* D.C. CODE ANN. § 16-2332 (LexisNexis 2012); 54 D.C. Reg. 864–67. Therefore, there is no implied right of action under § 16-2332(d-1)(1) for the same reasons there is no implied action under the MJPS generally.

In Count Eleven, plaintiff alleges that the District and its agencies failed to effectively enforce its gun and ammunition laws, specifically the Firearms Control Regulations Act of 1975,

as amended by the Firearms Registration Amendment Act of 2008.  Compl. ¶ 119–24.  This law contains no private right of action, and none should be implied.  Nothing from the text of the law or its legislative history indicates that the Council designed it to protect a particular class, rather than the public as a whole.  *See* D.C. CODE ANN. § 7-2502 (LexisNexis 2012); 56 D.C. Reg. 1356 (Feb. 13, 2009).  The law does not create any individual or substantive rights, or reveal any legislative intent to create a private damages remedy, but imposes criminal liability on those who violate the law.  D.C. CODE § 7-2507.02 (2012).  This is clearly a penal law meant to define crimes and punish their transgressors, not a civil law meant to compensate crime victims.  Courts have been particularly hesitant to imply a private civil right of action in a penal statute, because a private action may be "incompatible with the enforcement mechanism chosen by the Legislature," *Sheehy v. Big Flats Community Day*, 73 N.Y.2d 629, 634–35 (1989), and invite the judiciary to interfere with the executive discretion of law enforcement officials.  *See*, *e.g.*, *Hammer v. Am. Kennel Club*, 1 N.Y.3d 294, 298–300 (2003).[10]

In Count Twelve, plaintiff alleges that the District of Columbia Housing Authority failed to "monitor, scrutinize, regulate and/or enforce eviction standards to protect the residents and housing community or timely report illegal activity to DC and/or Federal law enforcement agencies," Compl. ¶ 126, in violation of federal and state housing laws, *id.* ¶¶ 125–126.  Plaintiff first cites D.C. CODE § 42-3602.  The law reads, in pertinent part:

> [A] housing provider may commence an action in the Court to recover possession of a rental unit or the Mayor may commence an action in the Court to evict a tenant or occupant in a rental unit.  The following persons may commence an

---

[10]  Implying a private right of action raises considerable separation of powers concerns.  The judiciary may only imply rights of action if it believes doing so accords with the intent of the legislature; otherwise a court would usurp the legislative domain and engage in bill drafting.  *See Wilder v. Virginia Hosp. Ass'n*, 496 U.S 498, 508 n.9 (1990) (Test for "determining whether a private right of action can be implied from a particular statute…reflects a concern, grounded in separation of powers, that Congress rather than the courts controls the availability of remedies for violations of statutes.").  In this instance, the Court is worried not only about invading the legislative domain— choosing who will enforce laws, and how—but also the executive domain—second-guessing the enforcement efforts of police officers.

> action to abate a nuisance in the Court: the Mayor, the United States Attorney for
> the District of Columbia, the civic association within whose boundaries the
> nuisance is located, or the community association within whose boundaries the
> nuisance is located.  The recovery or eviction shall be ordered if the Court has
> determined, by a preponderance of the evidence, that the rental unit is a drug
> haven or that a nuisance exists.

D.C. CODE § 42-3602(a) (2012).  The law then lists the factors a court should consider when

determining whether a unit is a drug haven.  D.C. CODE § 42-3602(a)(1)–(7) (2012).  There

might be an attenuated argument that this law protects public housing residents from living near

drug havens (since it allows local civic organizations to initiate eviction proceedings), although it

seems more directly related to protecting the interests of housing providers.  There is absolutely

no indication that the Council intended for § 42-3602 to afford crime victims a private right of

action if the government fails to evict residents of a "drug haven."  The law is very clear about

what rights it establishes—the right to initiate eviction proceedings—who has those rights—

housing providers, the Mayor, U.S. Attorney, and local civic associations—and the procedure for

exercising those rights—commencing an eviction action in the Landlord and Tenant Branch of

the Civil Division of the Superior Court, where that Court applies specific factors to determine

whether a unit is a drug haven.  D.C. CODE § 42-3602 (2012); D.C. CODE § 42-3601(6) (2012)

(providing controlling definition of "Court").  It would be a massive invasion of the legislative

prerogative for the Court to imply a private right of action from D.C. CODE § 42-3602.

The plaintiff next cites 42 U.S.C. § 1437f, the federal law governing low-income housing

assistance.  Section 1437f is a sprawling, comprehensive law whose text spans fifty pages in the

U.S. Annotated Code.  Nowhere in those pages does it explicitly create a private right of action.

The plaintiff does not indicate which portion of § 1437f defendants violated.  While the

plaintiff's Notice of Claim (incorporated by reference in the Complaint) alleges that many of the

events precipitating Jones' death happened in or near public housing units, Pl.'s Notice of Claim

10–11, the plaintiff does not explain how the District violated § 1437f or how this violation contributed to Jones' death.  The Court should not imply a private right of action for violations of 42 U.S.C. § 1437f.

The standard for determining whether a federal law provides an implied private right of action is similar to the standard applied to municipal laws.  However, federal courts have moved away from a rigid application of the four factors listed in *Cort v. Ash*, 422 U.S. 66 (1975) to focus more on "whether Congress intended to create, either expressly or by implication, a private cause of action."  *Touche Ross*, 422 U.S. at 575–76; *cf. id.* ("[T]he first three factors discussed in *Cort*—the language and focus of the statute, the legislative history, and its purpose—are ones traditionally relied upon in determining legislative intent.") (citations omitted); *compare Coates*, 768 A.2d at 1001 (D.C. Court of Appeals applies first three "*Cort* factors" to determine whether D.C. Council intended to imply private right of action).  In a more recent opinion, the Supreme Court emphasized that congressional intent is the most important factor:

> Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.  *Touche Ross & Co. v. Redington,* 442 U.S. 560, 578 (1979) (remedies available are those "that Congress enacted into law").  The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15 (1979). Statutory intent on this latter point is determinative.  *See, e.g., Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1102 (1991); *Merrell Dow Pharmaceuticals Inc. v. Thompson,* 478 U.S. 804, 812, n. 9 (1986) (collecting cases).  Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.  *See, e.g., Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 145, 148 (1985); *Transamerica Mortgage Advisors, Inc. v. Lewis, supra,* at 23; *Touche Ross & Co. v. Redington, supra,* at 575-576.  "Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 365, (1991) (Scalia, J., concurring in part and concurring in judgment).

*Alexander*, 532 U.S. at 286–87 (2001).  "Whether or not a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory interpretation," *Transamerica*, 444 U.S. at 15, and the court should "begin with the language of the statute itself," *id*. at 16.

Nothing in the text of § 1437f, or even its legislative history, indicates an intent to establish a private right, let alone a private remedy to vindicate that right.  *Cf. Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) ("But even where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private right but also a private remedy.'") (quoting *Alexander*, 532 U.S. at 286).  Several courts have rejected requests to infer a private remedy for violations of § 1437.  *See*, *e.g.*, *Edwards v. District of Columbia*, 628 F. Supp. 333, 340 (D.D.C. 1985) ("It is important to note that courts examining the legislative history and statutory language of the [United States Housing Act] have recently held that no private right of action in favor of tenants to enforce section 1437 was intended by Congress.").

Congress articulated the purposes behind 42 U.S.C. § 1437 as "assist[ing] States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families"; "assist[ing] States and political subdivisions of States to address the shortage of housing affordable to low-income families"; and "vest[ing] in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration, with appropriate accountability to public housing residents, localities, and the general public[.]"  42 U.S.C.A. § 1437(a)(1) (West 2012).  It appears Congress was not immediately occupied with preventing crime or abating violence.

The Complaint faults the government for failing to enforce eviction standards.  Compl. ¶ 126.  In refusing to imply a private right of action for a violation of § 1437, the Fourth Circuit

stated: "[I]t would plainly be inconsistent with any legislative scheme in the federal legislation to imply a private cause of action where the legal right invoked is one traditionally left to state law.  It would be hard to find an area of the law in which the states have a greater interest or have had greater involvement than in the legal area of landlord–tenant."  *Perry v. Hous. Auth. of City of Charleston*, 664 F.2d 1210, 1216 (4th Cir. 1981).  The D.C. Circuit has also recognized that the "landlord–tenant relationship [is] local in character and generally reserved for resolution by the states."  *Shivers v. Landrieu*, 674 F.2d 906, 912 (D.C. Cir. 1981).  The Court will not imply a right of action to vindicate an alleged violation of 42 U.S.C. § 1437f.

None of the statutes identified by plaintiff in Counts Nine, Ten, Eleven, and Twelve explicitly provide for a private right of action for damages.  After considering the plain text and legislative intent of each statute, the Court finds no reason to imply a private right of action in any of them, and will dismiss with prejudice all of plaintiff's statutory claims against the District of Columbia under Counts Nine through Twelve.

### 2.      *Plaintiff's Count Seven Claim for Racial Discrimination*

In Count Seven, plaintiff alleges that "[d]espite the fact that it is unlawful to discriminate against persons on the basis of their race, stereotypes, or assumptions about their racial group, place of residence, familiar status, and source of income, Defendants AUSA and District Agencies did just that."  *Id*. ¶ 104.  Plaintiff alleges that the victims and perpetrators of the shootings were young African Americans living in Wards 7 and 8 of Southeast Washington, D.C., where "there is a history of discrimination, isolation, and a failure to respond to and/or protect the community."  Compl. ¶ 105.  Plaintiff claims this racial discrimination violates Title VII of the Civil Rights Act of 1964 and the D.C. Human Rights Act of 1977.

Plaintiff's Title VII claim is clearly without legal merit.  Title VII bans employment discrimination.  42 U.S.C. § 2000e *et seq.* (2006).  Title VII creates a private right of action when an employer unlawfully discriminates against a member of a protected class.  *See*, *e.g.*, *Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008).  There is absolutely nothing in the Complaint relating to employment discrimination.  The plaintiff "concedes that Title VII only applies to employment discrimination."  Pl.'s Opp'n to Defs.' Mot. Dismiss 41.  Even if there were some possible claim under Title VII, plaintiff has failed to exhaust her administrative remedies by filing an EEOC charge within the specified period.  *Cf.* 42 U.S.C. § 12117(a) (2006); *Mayers v. Laborers' Health & Safety Fund of N. America*, 478 F.3d 364, 368 (D.C. Cir. 2007).  The Court must dismiss this claim with prejudice.

Plaintiff also fails to state a claim under the D.C. Human Rights Act of 1977.  The law states, in its opening paragraph:

> Every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life, including, but not limited to, in employment, in places of public accommodation, resort or amusement, in educational institutions, in public service, and in housing and commercial space accommodations.

D.C. CODE § 2-1402.01 (2012).  While parts of this sound general—ensuring an "equal opportunity to participate in all aspects of life"—the statutory provisions defining prohibited conduct, allowing exceptions, and establishing enforcement mechanisms are very specific.  *See* D.C. Code §§ 2-1202 (Parts A–G) (2012).  The D.C. Circuit has declined to take an expansive reading of the Human Rights Act and expand the scope of prohibited activities beyond the enumerated protected activities.  *Gersman v. Group Health Ass'n, Inc.*, 931 F.2d 1565, 1574 (D.C. Cir. 1991) ("Since the District of Columbia courts have declined to extend their interpretation of the statute outside the scope of the enumerated protected activities, we decline

to do so as well."). The plaintiff does not allege that Jones was denied employment, housing and commercial accommodations, public accommodations, education, or other enumerated activities on the basis of her race.

The plaintiff claims that her "Complaint clearly evinces the fact that Brishell Tashé Jones was denied equal access to hospital accommodations and emergency medical services because her life as an African American sixteen (16)- year old was valued less than other youths similarly situated." Pl.'s Opp'n to Defs.' Mot. Dismiss 41. Yet, the plaintiff makes this contention for the first time in her Opposition. *Cf. Henthorn*, 29 F.3d at 688 (factual allegations in briefs of memoranda of law may not be considered when deciding a Rule 12(b)(6) motion). Nowhere in the Complaint did plaintiff allege that the ambulance driver closest to the scene failed to arrive promptly—and "chose to run personal errands" instead, Compl. ¶ 42—because of racial discrimination, *see also id.* ¶ 79. The Complaint does not allege that the ambulance operators knew or suspected the victims were African American, or that discrimination played any role in their delayed response. Plaintiff fails to state a claim for racial discrimination under the D.C. Human Rights Act and the Court will dismiss this part of Count Seven without prejudice.

### D.    Plaintiff's Constitutional Claims Against the District of Columbia

The Complaint accuses a wide variety of government agencies and officials of racial discrimination. Plaintiff alleges that "DC government agencies' practices and procedures [ ] placed less value on the lives of African American youths in Wards 7 and 8, than similarly situated youths of other races in different Wards." Compl. ¶ 33. Plaintiff fails to allege that a state actor or someone acting under color of District law or custom violated plaintiff's constitutional rights; thus, the Court will dismiss plaintiff's claims against the District under Count One without prejudice. For the Count Six equal protection claim, plaintiff fails to allege

well-pleaded facts, as required by *Twombly* and *Iqbal*, that show that the District violated plaintiff's equal protection rights.  The Court will dismiss plaintiff's claims against the District of Columbia under Count Six without prejudice.

### 1.   Plaintiff's Count One 42 U.S.C. § 1983 Claim for Substantive and Procedural Due Process Violations

In Count One, plaintiff brings a § 1983 claim for a violation of plaintiff and decedent's substantive and procedural due process rights.  Compl.  ¶¶ 50–56.  Plaintiff argues her § 1983 claim falls under a "state created danger theory exception" that allows a municipality to be held liable, under § 1983, for injuries inflicted by private actors.  *Id*. ¶ 51; *see also Butera*, 253 F.3d at 649–57 (D.C. Circuit recognizes and provides elements for § 1983 "State endangerment" claim). According to the Complaint, the District had a "culture of action and inaction based on a policy of selective enforcement" and "discriminatory practices."  *Id*. ¶ 52.  It was District "policy, custom, and practice" to place "a lesser value on the lives of African American youths living in Wards 7 and 8" and "over an extended period of time" this "resulted in reduced, delayed, sabotages, and inferior quality provision of safety, health, and welfare services."  *Id*. ¶ 53.  These allegedly discriminatory practices "created and fueled a particular danger for Brishell Jones and youth similarly situated and were substantial factors and the proximate cause in bringing about the foreseeable harm, injury and death of" Jones.  *Id*.   The Complaint also alleges that the District did not "take reasonable steps to adequately train its employees" and its policies resulted in ineffective communication, poor leadership and follow-through, and general incompetence. *Id*. ¶ 54.  The District, plaintiff claims, exhibited an "obvious and deliberate indifference to the need for more and improved training and supervision," and this indifference "was a substantial factor and proximate cause" of Jones' death.  *Id*.   Count One states that the District and its

agents' and employees' "conduct was so egregious and so outrageous[] that it shocks the contemporary conscience." *Id.* ¶ 56.

Plaintiff brings these claims under 42 U.S.C. § 1983, which states in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (2006).   The District of Columbia is considered a "person" for the purposes of § 1983.  *See*, *e.g.*, *Best v. District of Columbia*, 742 F. Supp. 44, 46 (D.D.C. 1990).  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

"[A] a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. Dep't of Soc. Serv. of the City of New York*, 436 U.S. 658, 694 (1978) (emphasis in original)).  "It is only when the execution of the government's policy or custom… inflicts the injury that the municipality may be held liable under § 1983." *City of Canton*, 489 U.S. at 385 (internal quotation marks omitted); *see also Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986) (District subject to liability under § 1983 only "when an official policy or custom caused the complainant to suffer a deprivation of a constitutional right").  A "local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents;" only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" is "the government as an entity responsible under § 1983." *Monell*, 436 U.S. at 694;

*see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("[M]unicipal liability under §

19834 attaches where—and only where—a deliberate choice to follow a course of action is made

from among various alternatives by the official or officials responsible for establishing final

policy with respect to the subject matter in question.").  To support a § 1983 claim, "[a]t the very

least there must be an affirmative link between the policy and the particular constitutional

violation alleged."  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).

Plaintiff cannot, and does not, allege that the persons most directly responsible for Jones'

death—Carter, Best, Bost, and Simms—acted "under color of [a] statute, ordinance, regulation,

custom, or usage…of the District of Columbia."  42 U.S.C. § 1983 (2006).  Instead, plaintiff

rests her § 1983 theory on a "state created danger theory exception."  Compl. ¶ 51.  Plaintiff

claims that it established such an exception by showing:

> 1) the harm [to decedent] was foreseeable; 2) there was an affirmative state action
> that created or increased the risk to the victim; 3) there was a relationship between
> the state and the plaintiff that created a special danger to the victim as opposed to
> the public at large; and 4) there was a requisite degree of state culpability,
> typically deliberate indifference, in which the state actors used their authority to
> create an opportunity for the third party or private hard or rendered the individual
> more vulnerable to the danger.

*Id.*; *see also Butera*, 253 F.3d at 649–57 (providing elements for § 1983 "State endangerment"

claim).  It is not clear that plaintiff has met *any* of these conditions, let alone *all* of them.  First,

there may be doubts about the foreseeability of the harm to Jones, in particular; however, the

Court will defer discussing this factor because the others are so weak.

It is not clear which affirmative state actions the District took to increase the risk to

Jones.  The Complaint simply states, "D.C. government agencies, their directors', agents', and

employees' affirmatively acted in a way as to increase the risk of and actual danger resulting in

Brishell Jones' harm, injury, and death."  Compl.  ¶ 55.  The Complaint does not explain what

these affirmative acts were.  Plaintiff repeatedly argues that the District was negligent and incompetent in its monitoring of Sanquan and Orlando Carter, investigation of Howe's murder, and protection of African American youths in Wards 7 and 8.  For the reasons discussed *supra* Part IV.B.3, these kind of "police negligence" claims do not count as "affirmative state actions" under § 1983.  Therefore, these general allegations cannot support a § 1983 cause of action.

Plaintiff claims that the District failed to take "reasonable steps to adequately train its employees."  Compl. ¶ 54.  Plaintiff does not identify, in any particular way, how the District's training was deficient.  Plaintiff may want the Court to infer that since Jones died a "preventable" death, the training of the officers responsible for preventing such crimes must have been lacking.  *See, e.g.*, Pl.'s Opp'n to Defs.' Mot. Dismiss 22–23; Compl. ¶ 54 ("The poor and failed execution of the numerous duties assigned to the many specific officers, agents, and employees…stemmed from the…[District's] obvious and deliberate indifference to the need for more and improved training and supervision.").  The Supreme Court rejected such inferences in *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985):

> Here the instructions allowed the jury to infer a thoroughly nebulous "policy" of "inadequate training" on the part of the municipal corporation from the single incident described earlier in this opinion, and at the same time sanctioned the inference that the "policy" was the cause of the incident.  Such an approach provides a means for circumventing *Monell*'s limitations altogether.  Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.

*Id*. at 823–24.  The case here is even weaker.  Instead of inferring a policy of inadequate training from a single instance of unconstitutional conduct, plaintiff asks the Court to infer a policy from the fact that Jones died.  The plaintiff does not draw any connection between the specific actions it alleges the District took—e.g., failing to execute a search warrant at night, Compl. ¶ 38; failing

to arrest Orlando Carter sooner, *id*. ¶¶ 37–38; failing to monitor Sanquan Carter, *id*. ¶ 71;—and an established policy of inadequate training.  As the *Tuttle* Court stated, "At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged."  *Tuttle*, 471 U.S. at 823.  Therefore, the Court rejects the Complaint's conclusory, circular claims that the District maintained a policy of inadequate training as being sufficient to sustain a § 1983 claim.

The plaintiff incorporated by reference then-Attorney General Peter Nickles' leaked internal memorandum presenting his review of DYRS records of youths "arrested with murder and assault with the intent to murder in 2009 and 2010."  Nickles Report 1.  The Report makes "[g]eneral [o]bservations" about perceived flaws in DYRS's procedures and training programs.  Specifically, the Report states, "Sanquan Carter was locked up on several adult charges and DYRS even held a youth family team meeting at DOC in December 2009.  DYRS did not request a hold for his juvenile case.  In March[] 2010 he was released and DYRS received notice from CSOSA after his release.  Several days later he killed Jordan Howe."  *Id*. at 3.  However, the Complaint merely incorporates this Report by reference in a footnote, and the Civil Complaint does not make an affirmative connection between the alleged failure of DYRS to supervise Sanquan Carter and the general observations Nickles made about problems within DYRS.  Nor does the Civil Complaint allege how the DYRS's failures shocked the contemporary conscience, or explain how DYRS's failure to monitor Sanquan Carter was a proximate cause of Jones' death.[11]  Based on the facts alleged in the Complaint and all those documents incorporated therein, the plaintiff has not shown an affirmative connection between DYRS's failure to train its employees and *Jones*' death in particular.  Since the Court will

---

[11]   DYRS's failures may have proximately caused Jordan Howe's death, but the connection to Jones' death is much more attenuated.  Sanquan Carter was in jail when Brishell Jones was killed, and there were many intervening events—the retaliatory assault on Orlando Carter, the drive by itself—that could break the chain of causation.

dismiss Count One *without* prejudice, plaintiff may reassert an "inadequate training" claim if its amended allegations show an affirmative connection between DYRS's failures vis-à-vis Sanquan Carter and the death of Brishell Jones.

Even plaintiff's claim that the ambulance operators ran personal errands, rather than promptly responding, will not support a § 1983 claim. *See* Compl. ¶ 42. While this may be considered an "affirmative act," the Complaint does not relate this single event to any policy or custom of the District of Columbia, other than to repeat its suggestion that a background of racism, indifference, and discrimination informs all the District's policies. *See*, *e.g.*, *id*. ¶¶ 24–28, 33, 53, 99, 102–05, 130. There is no "affirmative link" between the actions of the ambulance operators and any municipal policy, and plaintiff fails in her attempts to infer such a policy "from [a] single incident." *Tuttle*, 471 U.S. at 823.

The Court fails to see how the Complaint alleges any affirmative action by the District created or increased the risk to Jones. But even if there were, the third requirement—that there be a relationship "between the state and the plaintiff that created a special danger to the victim as opposed to the public at large," Compl. ¶ 51—is clearly not met. This requirement is virtually identical to the "special relationship" needed to overcome the application of the public duty doctrine to plaintiff's common law torts. The Supreme Court, in *DeShaney v. Winnebago County Social Services*, 489 U.S. 189 (1989), held that there is no private remedy—under § 1983—for a State's failure to protect a citizen from violence inflicted by a private third-party, absent some "special relationship," *id.* at 197. The Court continued, "As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the due process clause." *Id.* For the reasons explained extensively in *supra* Part IV.B.1, there is no special relationship between the District and the plaintiff or

decedent.  Furthermore, there is no "deliberate indifference"—as required by the fourth prong of plaintiff's test—for the reasons stated in *supra* Part IV.B.3.

But, as the defendants point out, "[e]ven if [p]laintiff had alleged enough facts to state a claim under *Monell*, the Complaint does not allege facts to show any actual violation of substantive or procedural due process." Defs.' Mem. ISO its Mot. Dismiss 39.  Plaintiff does not even attempt to state a claim that the District deprived her of *procedural* due process—the requirement that the government must follow certain procedural requirements before it deprives individuals of protected interests.  *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).  Therefore, the Court will treat plaintiff's claims as falling under substantive due process only.

At the outset, the Court reemphasizes that "[a]s a general matter…a State's failure to protect an individual against private violence simply does not constitute a violation of the due process clause." *DeShaney*, 489 U.S. at 197.  To allege a violation of substantive due process, plaintiff must claim that she has been deprived of a fundamental right or liberty or property interest based in the Constitution, and the government deprived such right arbitrarily, deliberately, or in a manner that shocks the contemporary conscience.  *See*, *e.g.*, *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring); *County of Sacramento v. Lewis*, 523 U.S. 833, 846–48 (1998).  The Supreme Court has "made it clear that the due process clause guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Lewis*, 523 U.S. at 848.  "[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id*.  The Supreme Court has "repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id*. at 846 (quoting *Collins v. Harker Heights*,

503 U.S. 115, 129 (1992)).  The conduct must be "so egregious, so outrageous that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n.8.  For government actions to rise to the level of a Constitutional violation, they must consist of "*deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (emphasis in original).

This Court has previously rejected plaintiff's claims that the District's conduct "shocked the conscience" and will not belabor that discussion here.  The Court finds that the District has not engaged in acts "shocking the contemporary conscience" for the reasons stated in *supra* Part IV.A and Part IV.B.4.  Furthermore, plaintiff has not alleged that the District engaged in any deliberate decisions to deprive plaintiff or decedent of their constitutional rights.  Therefore, plaintiff has failed to allege facts that could support a finding of either a substantive or procedural due process violation.  The Court will dismiss all plaintiff's claims against the District of Columbia under Count One without prejudice.

### 2.   *Plaintiff's Count Six Claim for Equal Protection Violations*

In Count Six, plaintiff claims that "[b]ut for the…District government officials', agencies', and employees' customs, practices, and longstanding policies instituted and sanctioned by the District of racial discrimination and deliberate indifference to the safety, welfare, and lives of African American youths in the District of Columbia, Brishell Jones and the other victims of the March 30 drive-by shootings, were deprived of the rights, privilege, and immunities guaranteed to them by the Constitution of the United States." Compl. ¶ 102.  Since the District deprived Jones of her constitutional rights because she was an African American—a member of a protected class—plaintiff claims that the District violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* ¶¶ 98–102.

This Count fails to state a claim for relief for many of the same reasons Count One fails. *See supra* Part IV.D.1. The plaintiff fails to allege facts that could support a finding that there was some District customs, practices, or policies that deprived Jones of her constitutional rights; the plaintiff simply claims that such policies exist. The specific acts District representatives took in policing the community, investigating the shootings, and providing emergency care cannot establish such a municipal policy. The plaintiff fails to allege facts that the District acted in deliberate indifference to Jones' constitutional rights. There is no clear causal connection between any District "policies" and the harm to plaintiff. The vast majority of the conduct plaintiff complains about is covered by the local public duty doctrine, and the analogous federal rule established in *DeShaney*.

The Complaint does not explain how defendants' actions or inactions were motivated by racial discrimination. It simply states that Jones was an African American youth, Compl. ¶ 101, and makes a blanket assertion that the government has systematically discriminated against African American youths in Southeast Washington, D.C., *id.* ¶¶ 102, 104–05. Much of the Complaint is filled with these kinds of conclusory statements—where plaintiff presents a mix of legal conclusions and unsupported characterizations as "facts." *See*, *e.g.*, *id.* ¶¶ 24–28, 33, 53, 86–88, 99, 102–05, 130. The Court is under no obligation to accept plaintiff's legal conclusions or unsupported factual statements as true. *See*, *e.g.*, *Twombly*, 550 U.S. at 555. Instead, the Court must base its decision on the "well-pleaded facts" and the factual inferences that it can reasonably draw from those facts. *See*, *e.g.*, *Iqbal*, 556 U.S. at 678–79.

Although the Complaint is not subject to a heightened pleading standard, it still fails the requirements of *Twombly* and *Iqbal*. While only a "'short and plain statement of the claim showing that the pleader is entitled to relief'" is necessary, the "plaintiff's obligation to provide

the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[;]…factual allegations must be enough to raise a right of relief above a speculative level." *Twombly*, 550 U.S. at 555 (2007) (quoting *Conley*, 355 U.S. at 47) (quoting Fed. R. Civ. P. 8(a)(2)).[12]

Plaintiff relies heavily on language from two cases—*Conley v. Gibson*, 335 U.S. 41 (1957); and *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)—that the *Twombly* Court heavily distinguished. Plaintiff quotes the exact language from *Conley*—"a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," 335 U.S. at 45–46 (quoted in Pl.'s Opp'n to Defs.' Mot. Dismiss 5)—that the *Twombly* Court cautioned against reading too literally. *Twombly*, 550 U.S. at 561–63. The *Twombly* Court warned that under "a focused and literal reading of *Conley*'s 'no set of facts,' a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery.'" *Id.* at 561. After thoroughly discussing the judicial and academic aversion to this language, the Court concluded: "We could go on, but there is no need to pile up further citations to show that *Conley*'s 'no set of facts' language has been questioned, criticized, and explained away long enough." *Id.* at 562.

Furthermore, plaintiff cites *Swierkiewicz* for the proposition that "the complaint need not plead the elements of a prima facie case." Pl.'s Opp'n to Defs.' Mot. Dismiss 9 (citing 534 U.S. at 511–14). The *Twombly* Court explained that *Swierkiewicz* "did not change the law of

---

[12]     The kind of vague, conclusory pleading disallowed by *Twombly* and *Iqbal* is endemic to plaintiff's Complaint. This discussion of *Twombly* and *Iqbal* is applicable to many of plaintiff's other Counts. In the interest of brevity, the Court discusses *Twombly* and *Iqbal* in the context of Count Six, where the failure to plead facts rather than conclusions is most pronounced.

pleading, but simply re-emphasized…that the Second Circuit's use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules' structure of liberal pleading requirements." 550 U.S. at 570 (internal quotation marks and citations omitted). The Court then emphasized that, like in *Swierkiewicz*, *Twombly* does not establish a heightened pleading standard, but explains that the Rule 8 standard requires "enough facts to state a claim to relief that is plausible on its face." *Id*. Therefore, *Swierkiewicz* does not change how the Court would apply the *Twombly* and *Iqbal* pleading standards.

Like in *Twombly*, "on [a] fair reading" plaintiff's allegations that the District sanctioned policies of racial discrimination "are merely legal conclusions resting on the prior allegations." *Id*. at 564. The Supreme Court does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. *Twombly* clarified that mere labels and conclusions—without pleading facts that could lead someone to apply those labels or make those conclusions—is not enough to meet this plausibility standard.

*Iqbal* elaborated on *Twombly*, and stated that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). *Iqbal*'s elaboration of *Twombly* explains the standard very well, and is worth quoting in full:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Twombly*], at 5705. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*., at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short

of the line between possibility and plausibility of 'entitlement to relief.'"   *Id*., at 55 (brackets omitted).

Two working principles underlie our decision in *Twombly*.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  *Id*., at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)).  Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Id*., at 556.  Determining whether a complaint states a plausible claim for relief will…be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense….  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief."  Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id*. at 678–79.  The complaint at issue in *Iqbal* is significantly similar to the Complaint in the present case.  In *Iqbal*, the plaintiff alleged that defendants "knew of, condoned, and willfully and maliciously agreed to subject [him] to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest."  *Id*. at 680.  The Supreme Court rejected "[t]hese bare assertions" as amounting "to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim, namely, that petitioners adopted a policy because of, not merely in spite of its adverse effects upon an identifiable group.  As such, the allegations are conclusory and not entitled to be assumed true."  *Id*. at 681 (citations and internal quotation marks omitted).

As in *Iqbal*, the plaintiff in this case makes a bare assertion that the government took action—in violation of the equal protection clause—because of membership in an identifiable group. The plaintiff does not allege facts showing that the District adopted the allegedly discriminatory policies because of any discriminatory motive. The Complaint is even ambiguous about which policies, in particular, are discriminatory. The Complaint singles out the "customs, practices, and longstanding policies instituted and sanctioned by the District of racial discrimination and deliberate indifference to the safety, welfare, and lives of African American youths in the District of Columbia." Compl. ¶ 102. *Which* policies are these? The Complaint does not explain this, other than applying further conclusory labels—they are the practices of "selective enforcement," *id*. ¶ 27; failing to "exercise appropriate measures, follow sound protocols and process to protect the community," *id*. at ¶ 26; "irresponsible judgment and decision-making," *id*. ¶ 99; "negligence [and] gross negligence," *id*.; "willful disregard," *id*.; and "deliberate indifference," *id*. As explained extensively *supra*, when the Court looks at what the Complaint alleges District officials actually did—apart from the gloss the plaintiff puts on those acts—the facts do not support the majority of plaintiff's claims. The facts alleged do not state a claim for an equal protection violation, and the Court will dismiss Count Six without prejudice.

### E.    Plaintiff's Other Claims Against the District of Columbia

Plaintiff makes several claims that, simply put, are not recognized causes of action or torts in the District of Columbia. "New torts are recognized when an interest requiring protection from unreasonable interference is identified." *Holmes v. Amerex Rent-A-Car*, 710 A.2d 846, 848 (D.C. 1998). With a few narrow exceptions, federal courts do not make federal common law. *Compare Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (no general federal common law) *with American Elec. Power Co., Inc. v. Connecticut*, 131 S. Ct. 2527, 2537 (June

20, 2011) (Clean Air Act displaces federal common law regarding carbon dioxide emissions). This Court, with pendant jurisdiction over plaintiff's common law claims, will decline to invade the prerogative of the Title I courts by recognizing three new ill-defined and unnecessary causes of action, and will dismiss Counts Five, Eight and Thirteen with prejudice.

### 1.   *Plaintiff's Count Five Claim for Egregious Incompetence*

The District of Columbia has never recognized a common law cause of action for "egregious incompetence."  To the extent the incompetence of District officials caused plaintiff harm, plaintiff may—and has—seek recourse through recognized torts such as wrongful death, negligence, and gross negligence.  The plaintiff may—and has—bring a § 1983 claim if District representatives violated plaintiff's constitutional rights.  The Court refuses to recognize a cause of action for "egregious incompetence" and dismisses this count with prejudice.

### 2.   *Plaintiff's Count Eight Claim for Executive Abuse of Power/Authority*

There is no freestanding, common law cause of action for "executive abuse of power/authority."  As with the egregious incompetence count, if the defendants' abuse of power or authority has harmed plaintiff, the plaintiff may seek recourse through wrongful death, negligence, or § 1983.  There is no reason to create a new cause of action for this behavior.  The Court will dismiss Count Eight with prejudice.

### 3.   *Plaintiff's Count Thirteen Claim for*
### *Fraud, Waste and Misuse of Federal Funds*

In Count Eight, plaintiff claims that the Justice Grants Administration, by "giv[ing] Peaceaholics grant funds to run Peace Abode," failed "to make sure grant funds were used and administered according to the law in an effort to keep D.C. residents…safe."  Compl. ¶ 128.

There is no common law cause of action for "waste and misuse of federal funds."[13]  The federal government may put conditions on its grants to state and local governments, and may monitor how its money is spent.  *See generally*, Peter J. Smith, *Penhurst, Chevron, and the Spending Power*, 110 YALE L.J. 1187 (2001).  There is generally no private right of action for individual taxpayers who disagree with how agencies spend money, or those who claim to be harmed by a "misuse" or "waste" of funds.  *See*, *e.g.*, *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 593 (2007) ("It has long been established, however, that the payment of taxes is generally not enough to establish standing to challenge an action taken by the Federal Government."); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 349–50 (plaintiffs cannot leverage their status as municipal taxpayers to challenge how state funds are spent); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 217 (1974) ("The Court has previously declined to treat 'generalized grievances' about the conduct of Government as a basis for taxpayer standing.").  There is no general cause of action or tort for a "waste or misuse of federal funds," and the Court will not create one here.

The False Claims Act allows a private person to bring a *qui tam* claim against a public contractor for the fraudulent misuse of federal funds.  31 U.S.C. § 3729, *et seq.* (2006).  However, the False Claims Act is limited to specified types of "fraudulent claims," and includes detailed procedures for bringing a claim under the Act.  *See* 31 U.S.C. §§ 3729–30 (2006).  The Court cannot construe, in good conscience, Count Thirteen as intending to state a claim under the False Claims Act.  Compl. ¶¶ 127–28; *cf. Adams*, 711 F.2d at 187 ("[C]ourts must consider a

---

[13]    Presumably, the plaintiff accuses Peaceaholics of the relevant "fraud," but it is hard to tell from the Complaint. Without a doubt, if plaintiff were accusing the Justice Grants Administration or any other part of the D.C. government of fraud, there is *no way* plaintiff has met the heightened pleading standard for fraud claims, Fed. R. Civ. P. 9(b), or even the generally applicable pleading requirements, *see Twombly*, 550 U.S. at 560–70 (discussing different pleading requirements for different types of claims).

request for relief if the plaintiff can succeed on any theory, whether advanced in the complaint or not."). The Court must dismiss Count Thirteen with prejudice.

## IV.    CONCLUSION

Plaintiff is obviously heartbroken over the tragic death of her only daughter. She feels like her daughter's death was preventable, and that the District could have and should have done more. She wants to see changes made to a system that, she feels, fails to protect vulnerable communities. Her frustration is understandable.

However, there are strong limits placed on what the courts can do to address these grievances. There is no general power to "put the system on trial" whenever the government fails to take care of its citizens. The United States Supreme Court, and the District of Columbia Court of Appeals, have repeatedly emphasized that the judiciary is ill-equipped to address issues of crime prevention and police judgments. Only under very narrow circumstances—a special relationship between a government official and the particular person injured, a statute mandating that officials take specified actions to protect a discrete class, deliberate government action that shocks the contemporary conscience—will the government be liable for failing to prevent private violence. These high barriers to suit prevent the judiciary from overstepping its bounds and invading the legislative and executive prerogatives.

It is not enough to say that a death was "preventable" or, in hindsight, police had opportunities to intervene earlier. The public duty doctrine protects police officers from this kind of judicial second-guessing. When presented with heartbreaking facts such as these—an innocent bystander stuck down in her youth, by remorseless thugs pursuing a trifling vendetta—a jury might be overcome with emotion and look for *someone* to hold financially accountable. But police officers cannot prevent every crime. By the very nature of their jobs, often there will be

dire consequences when officers choose, what was in hindsight, the "wrong" path.   Police officers make quick, delicate decisions; to function, they cannot have every choice scrutinized. To prevent the threat of liability from crippling police and emergency services, the public duty doctrine creates a very high bar for suing the government for negligence.

If the Court held that the District could be civilly liable for damages in this case, it could create some perverse incentives and interfere with the effective policing of the District.   For example, plaintiff blames the District for not arresting Orlando Carter sooner.  The U.S. Attorney for the District of Columbia did not think there was sufficient evidence for an arrest warrant. Compl.    ¶ 39.  The potential liability for a wrongful death suit could, in many cases, outweigh the potential *Bivens* liability for conducting an improper seizure.[14]  If civil liability attached for failing to obtain a warrant, prosecutors and police might err on the side of violating the Constitution.  Plaintiff chastises the MPDC for not seeking authorization for a nighttime search, Compl. ¶ 38, but neglects to mention part of why nighttime searches are be disfavored.  Shouting "Police!" at a sleeping suspect may create an increased danger to the officers executing the warrant, especially if the officers suspect that there are weapons on the premises.[15]  By finding

---

[14]     *Cf. Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (recognizing private right of action for illegal search and seizure);  Alexander A. Reinert, *Measuring the Success of* Bivens *Litigation and its Consequences for the Individual Liability Model*, 62 STAN. L. REV. 809 (2010) (presenting empirical study on (lack of) success for *Bivens* actions); Robert M. Bloom & David H Fentin, *"A More Majestic Conception": The Importance of Judicial Integrity in Preserving the Exclusionary Rule*, 13 U. PA. J. CONST. L. 47, 66–67 (2010) (arguing that civil liability for damages under *Bivens* for unlawful searches and seizures does not provide an adequate deterrent effect on police officers).

[15]     *Cf.* Jeffry R. Gittins, *Excluding the Exclusionary Rule: Extending the Rationale of* Hudson v. Michigan *to Evidence Seized During Unauthorized Nighttime Searches*, 2007 B.Y.U. L. REV. 451 (comparing rationales for aversion to nighttime searches to rationales for knock and announce rule); Paul Duggan, *Steely determination, deadly retribution*, WASH. POST, June 4, 2010, at A1 ("D.C. Superior Court judges usually cannot allow searches at night, for safety reasons: When people are abruptly awakened by strangers barging into their homes (even strangers yelling "Police!"), they tend to react badly, and things can turn ugly fast, especially if guns are involved.  By D.C. law, judges can authorize night searches in non-drug cases only under exigent circumstances—for instance, when there's a clear threat that evidence will be lost if a search is delayed.") (reporting on the chain of violence that lead to the death of Brishell Jones).

liability for not pursuing a nighttime search, the Court may force officers to weigh potential civil liability against their personal safety.

Plaintiff also claims that the District, by passing crime measures and engaging the local community, has singled out African American youths in Wards 7 and 8 for protection as a special class. *See*, *e.g.*, Compl. ¶ 75. But the plaintiff also argues that the District has systematically *ignored* such African American youths. *See*, *e.g.*, Compl. ¶ 98–105. On one hand if the District does not provide adequate protection to Wards 7 and 8, it has racially discriminated against that community in violation of the Constitution. *See id.* But if the District engages with that community, increases police activity, and makes special efforts to protect African American youths from violence, the District has now established a "special relationship" and become the insurer of that community. *See*, *e.g.*, Compl. ¶ 75. In other words, if it increases police engagement, it has become liable in tort; if it decreases police engagement, it has become liable under Section 1983. It would provide grossly distorted incentives if, when a police department dedicates additional resources to a high crime area, it could become financially liable for every crime it failed to prevent in that area.

Based on the facts alleged in the Complaint, only a narrow set of plaintiff's claims survive defendants' Motion to Dismiss. The Court dismisses plaintiff's common law, § 1983, and constitutional claims without prejudice to refile, and with leave to amend the Complaint. This gives the plaintiff another chance to plead facts showing municipal liability, and ensures that the Court does not prematurely dismiss, on the merits, potentially plausible claims.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on January 7, 2013.